UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| **VS.** § | **NO. 4:22-cr-00612-3** |
| § | |
| **JOHN RYBARCZYK** § | |

**RYBARCZYK'S OPPOSED MOTION
TO MODIFY CONDITIONS OF RELEASE**

TO THE HONORABLE ANDREW HANEN, UNITED STATES DISTRICT JUDGE:

Defendant, JOHN RYBARCZYK ("Rybarczyk") is a United States citizen with no criminal history or foreign ties, and who is charged with the nonviolent crime of securities fraud based on the novel theory that Twitter users commenting online about stocks have a duty to disclose their stock sales to all Twitter users. Despite this, the government has demanded that Rybarczyk wear a GPS ankle monitor, not because of his own risk of flight, but because it would help the government achieve "parity" with the other charged defendants. That reasoning is inappropriate under the Bail Reform Act, and because of this, Rybarczyk moves this Court to amend his conditions of release to remove the ankle monitor.

### I.   Relevant Procedural History

On December 7, 2022, Rybarczyk was charged in Counts 1, 2, 4, 7, and 8 of an Indictment with "Conspiracy to Commit Securities Fraud" and "Aiding and Abetting Securities Fraud" in violation of 18 U.S.C. §§ 2, 11348, and 1349.  Dkt. 1 at pp.37-8.[1]

---

[1] A superseding indictment, which added multiple new counts against Rybarczyk, but apparently no new factual allegations, was filed by the government on February 9, 2023.

1

On December 13, 2022, law enforcement attempted to execute an arrest warrant at Rybarczyk's home in Texas; however, Rybarczyk, at that time, was on vacation in Nashville, Tennessee. Upon being informed of the charges, Rybarczyk voluntarily surrendered to law enforcement in Nashville. That same day, a magistrate judge in the Middle District of Tennessee released Rybarczyk, effectively on his own recognizance, with the only restrictions being placed on his travel requiring the surrender of his passport and the limiting of his travel outside of Texas and Tennessee without the preapproval of Pretrial Services. The conditions imposed by the Tennessee judge did *not* including electronic monitoring. *See* Dkt. 71.

On December 15, 2022, Rybarczyk voluntarily returned to Texas and appeared in this district before U.S. Magistrate Judge Christina A. Bryan, who ordered the bond conditions from Tennessee null and void and issued new conditions. *See* Dkt. 29-30; Docket Text for December 15, 2022. The new bail conditions included Stand Alone Monitoring and Location Monitoring Technology by GPS. Dkt. 30 at pp. 2-3 ¶¶ p(iv), q(iv), and (t). No individualized assessment of Rybarczyk was conducted prior to the imposition of electronic monitoring.

During the now two months that he has been on pretrial supervision, Rybarzyk has committed no infractions, he has followed directions from pretrial, and he has not fled.

## II.   Argument and Authorities

**A.   The Bail Reform Act Mandates an Individual Assessment, which did not occur for Mr. Rybarczyk.**

Because it is a well-settled principle of American jurisprudence that every criminal defendant is presumed innocent until found guilty by plea or trial, it is the default position under the Bail Reform Act that persons charged with an offense (when not detained) be released "on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court," subject only to the conditions that the person provide DNA when required and not

commit any other crimes. *See* 18 U.S.C. 3142(b). Additional conditions must not be imposed "*unless* the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. 3142(b), c(1).

Even after a judge makes a reasoned determination that deviation from the "recognizance" default is necessary and that additional conditions are warranted, the Bail Reform Act further dictates that the defendant must be "(B) subject to the *least restrictive further condition, or combination of conditions*, that … will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. 3142(c)(1)(B). The Act identifies a number of factors for courts to consider in assessing what the "least restrictive" conditions will be, including: (1) the "nature and circumstances of the offense charged" including whether it involves sex trafficking, violence, terrorism, minors, drugs, or weapons; (2) "the weight of the evidence against the person;" (3) the "history and characteristics of the person" including their health, character, community ties and criminal history; and finally, (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. 3142(g). Finally, the Bail Reform Act "clearly contemplates that each person has the right to separate consideration, to stand or fall on the merits of his own case rather than on the misdeeds of his co-defendants." *United States v. Briggs* 476 F.2d 947, 948 (5th Cir. 1977). The factors are, by their nature, fact specific to each defendant requiring an individual assessment.[2]

As an initial matter, there is no evidence that Rybarczyk is either a danger to himself or others or a flight risk. No relevant facts showing otherwise have ever been identified by the

---

[2] These factors are similar to and foreshadow the sentencing factors at 18 U.S.C. 3553(a) which also necessitate an individualized assessment.

3

Government, either in Tennessee or Texas. On this measure alone, the Bail Reform Act mandates personal recognizance or an appearance bond, and effectively precludes highly restrictive conditions such as electronic monitoring. *See* 18 U.S.C. 3142(b).

Moreover, no individual assessment of danger or flight risk was conducted here. In fact, electronic monitoring was sought (and imposed) completely without regard to each Defendants' unique circumstances. *See also* Dkt. 47 (Matlock); Dkt. 49 (Knight); Dkt. 64 (Constantinescu); Dkt. 96 (Cooperman). Indeed, the Government, seeking to add GPS monitoring to co-Defendant Hennessey's conditions (weeks after Rybarczyk's conditions were imposed) alleged that the provisions "are standard in this district" and would "bring him into parity with his multiple co-defendants" and "others similarly situated." *See* Dkt. 99 at p. 2. "Parity" with others is simply not a factor mentioned under the plain language of the Bail Reform Act.

Despite this, the government continues to treat the defendants as if they are simply one person. As an example, the Government admitted, in its response to Defendant Cooperman's recent request for domestic and international travel, as well as the return of his passport [Dkt. 131], that it had *no objection* to Cooperman's domestic travel, but that "**each defendant** in this case presents a flight concern **if allowed to travel internationally."** Dkt. 132 at p. 3 (emphasis added). The Government then raised the spectre that "other [international travel] requests may come, given the Court's Order for parity of conditions of release." *Id.* **Thus, while conceding that all Defendants, including Rybarczyk, are not flight risks if travel is restricted to the United States,** the crux of the government's argument concerning electronic monitoring hinges on the nonsensical assumption that every criminal defendant, regardless of citizenship, wealth, family ties, or other factors, is a flight risk simply for traveling outside of the United States. That cannot be true.

The Government's reasoning is also contrary to the Act's required individualized assessment.[3]  The true effect of this so-called "standard" electronic monitoring condition is that all Defendants are treated the same regardless of their individual circumstances.  The Defendants in this case are *not* "similarly situated" to one another. They each have different charges, citizenship, ties to the district, histories, property, family circumstances, etc.  For example, while attempting to paint all defendants with the same brush, the Government conceded in its response to Cooperman's travel motion that Cooperman has foreign citizenship. Dkt. 132 at p. 3.  Rybarczyk, of course, does not have foreign citizenship, thereby differentiating the two cases entirely.

In short, defendants are "entitled to know the reasons why the particular conditions of release were imposed in *his* case." *Briggs,* 476 F.2d at 948. "The Bail Reform Act expressly requires this." *Id.*  No such analysis occurred with Rybarczyk.  If it had, an ankle monitor would not have been imposed.

**B.    The 18 U.S.C. 3142(g) factors strongly weigh in favor of removal of the GPS-monitoring bracelet.**

To the extent that this Court will determine, *de novo*, that the factors set forth under Title 18, United States Code, Section 3142(g) should be applied to Mr. Rybarczyk, those factors strongly weigh in favor of removal of the GPS bracelet.

**1.   Nature and Circumstances of the Offense - Rybarczyk is Charged with a Non-Violent Offense Under a Novel Theory**

This is not a violent, drug, sex, terror, or other crime identified by the Act.  Instead, the Indictment alleges a conspiracy to commit securities fraud and securities fraud through s*ocial media posts* in violation 18 U.S.C. §§1348 and 1349, a novel theory only *once* prosecuted in

---

[3] The Court can evaluate whether GPS is a "standard" condition in this District based on its own experience.

5

American history and resulting in a conviction under a different statute and a different set of facts.[4] Any crimes Rybarczyk is alleged to have committed were online without regard to his physical location. Thus, GPS monitoring is irrelevant to the alleged offenses or risk of recidivism.

    2. The Weight of the Evidence Against Rybarczyk is Weak

The government's novel theory in this case is that amateur Twitter users, who warned followers that their Tweets were not to be construed as investment advice, had a duty (from where this duty arose the government does not say) to tell their followers when they were selling their own shares of a publicly held stock. Putting aside for the moment whether this is even an actual crime (it is not), the primary evidence against Rybarczyk appears to be his social media posts (Tweets). Aside from omitting that these were accompanied by the above noted disclaimer, the Indictment frequently fails to allege what is false about Rybarczyk's posts, let alone allege any cause and effect relationship between his posts and actions by third parties or the stock price. *See* Dkt. 1.[5]

As an example, in paragraph 45 of the Indictment, the government alleges that "RYBARCZYK falsely claimed in a tweet that "$GTT 24RSI +++ major multi billion $$$ catalyst," without explaining why that Tweet was false. While the government then suggests that Rybarczyk omitted to also Tweet that "he intended to sell his own shares of GTT," it is unclear how that information rendered the Tweet false or how and why Rybarczyk was obliged to tell the Twitter universe as to when he planned to sell shares, to the extent that Mr. Rybarczyk even knew at the time he made that Tweet. Notably, despite attempting to tie the Tweet into a conspiracy together with other charged defendants, the government concedes that the entire profits from the

---

[4] *United States v. Steven Gallagher,* No. 1:22-01-00122-VEC-1 at ECF No. 28,(S.D.N.Y. July 6, 2022) (Caproni, J.) (Defendant convicted of 15 U.S.C. § 78j(b), 15 U).

[5] This may be further addressed in a motion for a bill of particulars.

allegedly criminal stock sales set forth in paragraph 45 were less than $2,000 total for three individuals (less than $700 per defendant).

In short, the Government's theory is a classic post hoc, ego propter hoc fallacy, that stock purchases following one of the purported social media misstatements occurred because of these social media posts. It is axiomatic that these stocks were and would have been traded (and likely still are) in the absence of any social media activity by Defendants and that individuals buy and sell according to their own goals, strategy, and risk tolerance. Moreover, even a rudimentary examination of the tweets at issue reveals that Defendant's social media connections were often trading purely on momentum. Some were grateful for his tweets. There were also so tweets from trolls accusing Rybarczyk and his followers of being involved in a "pump and dump" scheme. This begs the question whether many of the so-called victims are, instead, unindicted co-conspirators.

### 2. Rybarczyk's History and Characteristics Prove He is Not a Flight Risk

Rybarczyk's history and characteristics of substantial personal and financial ties to this district and the United States negate any purported concern he is a flight risk.

Rybarczyk, who has no criminal history or history of abusing drugs or alcohol, is a United States citizen. He was born and raised in Virginia and moved to this district in March, 2021, where he resides with his pregnant wife (married April 28, 2018), minor stepson (age 7), and their daughter (age 1), all of whom are also only United States citizens. Rybarczyk has no foreign ties; he speaks no foreign languages; he has never lived abroad; he owns no foreign property or bank accounts; and, he has traveled abroad in the past to destinations such as France, Italy, Mexico and the Bahamas, solely for tourism and never for business.

To the contrary, *all* of Rybarczyk's ties are to the United States. The Rybarczyks still own their previous home in Fredricksburg, VA. Rybarczyk's mother lives in Virginia Beach, VA, while his father lives in Vero Beach, FL. Rybarczyk has two adult sisters: one in Virgnia Beach, VA, and another in Richmond, VA. His wife's parents live in Fredericksburg, VA. However, his in-laws also own property in this district near Rybarczyk's home. That house is occupied by one of his wife's sisters while the other lives with the Rybarczyks. His wife's brother also lives in the same neighborhood. As evidenced by the forfeiture allegations in the Indictment, Rybarczyk has substantial real property holdings in this district. *See* Dkt. 1 at p. 42-43, ¶¶132-135. His personal and financial community ties are wide and deep. Accordingly, flight in this situation would require Rybarczyk to abandon all of his properties and both he and his wife's immediate families, then somehow successfully flee this country without the use of a passport. Nothing in his history or characteristics indicates this it is even remotely likely.

The Court should also examine Rybarczyk's conduct in this case. Upon learning of the charges, Rybarczyk contacted authorities in the Middle District of Tennessee to voluntarily turn himself in *while he was on vacation.* Rybarczyk, *though informed in Court of the serious charges against him prior to release did not run* and appeared with counsel in this district. Rybarczyk has surrendered his passport. Rybarczyk also posted a $1,000,000.00 bond secured by a $100,000.00 cash deposit. Dkt. 29; *See also* Docket text for December 16, 2022. All of these actions are counter to any notion that Rybrczyk is a flight risk.

3. **Rybarczyk Presents No Danger to Any Person or the Community and The Ankle Monitor Is a Public Presumption of Guilt**

There has never been a suggestion or evidence that Rybarczyk is a danger to any person or the community, let alone one that could be mitigated by location monitoring. The ankle monitor is unnecessary and interferes with Rybarcyk's right to be free from excessive bail conditions. In

8

1987, Chief Justice Rhenquist observed that, "[t]he only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil." *United States v. Salerno,* 481 U.S. 739, 754 (1987). He continued "[o]f course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response." *Id.* In this case, as shown by Rybarczyk's deep personal and financial ties to the community, and significant cash deposit, the perceived evil of a flight risk is illusory and the response, an ankle monitor, is excessive and harmful.

Ankle monitors are a scarlet letter in the modern age. To the community it is a marker of criminality contradicting the presumption of innocence. They are humiliating, physically uncomfortable, especially during exercise, and make random beeping sounds and vibration s that interrupt sleep and alerts others to its presence.[6] The significant interruption of sleep caused by the GPS bracelet is a particular concern for Rybarczyk, who suffers from sleep apnea and uses a CPAP machine at the direction of his physician. Put simply, the bulk and heft of the GPS bracelet, which wakes Rybarczyk up multiple times each night, is taking a toll on Rybarczyk's physical health.

For many Defendants, ankle monitors are an alternative to pre-trial detention and appropriate. But, Rybarczyk is not among them. It is unnecessary and excessive.

---

[6] *See, e.g.,* Betancourt, Sarah, *"Traumatizing and abusive": Immigrants reveal personal toll of ankle monitors.* The Guardian (July 12, 2021) available at https://www.theguardian.com/us-news/2021/jul/12/immigrants-report-physical-emotional-harms-electronic-ankle-monitors (last viewed February 8, 2023).

**Conclusion**

Defendant, JOHN RYBARCZYK, requests that this motion be granted and his conditions of release be amended to remove the GPS ankle monitor.

Respectfully submitted,

**HILDER & ASSOCIATES, P.C.**

/S/ *Philip H. Hilder*
Philip H. Hilder
Texas Bar No. 09620050
Q. Tate Williams
Texas Bar No.: 24013760
Stephanie K. McGuire
Texas Bar No. 11100520
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
philip@hilderlaw.com
tate@hilderlaw.com
stephanie@hilderlaw.com

Eric Samuel Rosen
Freedman Normand Friedland LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel: (617) 977-4163
erosen@fnf.law

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, a true and correct copy of the above and foregoing Motion for Leave to File Additional Pretrial Motions was served on all counsel of record via ECF, certified mail, return receipt requested, facsimile, electronically, or hand delivery.

/s/ *Philip H. Hilder*
Q. Tate Williams

## CERTIFICATE OF CONFERENCE

On February 13, 2023, undersigned counsel communicated with Scott Armstrong, Assistant United States Attorney, by electronic mail who indicated he was OPPOSED to this Motion.

/s/ *Q. Tate Williams*
Q. Tate Williams