UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | NO. 4:22-cr-00612-3 |
| | § | |
| JOHN RYBARCZYK | § | |

---

**RYBARCZYK'S MOTIONS TO DISMISS SUPERSEDING INDICTMENT**

---

TO THE HONORABLE ANDREW HANEN (UNITED STATE DISTRICT JUDGE):

Defendant John Rybarczyk, joined by co-Defendants Thomas Cooperman and Gary Deal,

respectfully submits multiple, independent motions to dismiss the Superseding Indictment:

1)      Motion to dismiss, in part, because Rybarczyk had no duty to disclose his stock sales;

2)      Motion to dismiss, in full, because the Superseding Indictment fails to allege the materiality of the alleged misstatements and omissions;

3)      Motion to dismiss, in full, because Rybarczyk had no notice that Title 18, United States Code, Section 1348 affirmatively required him to disclose his stock sales on Twitter;

4)      Motion to dismiss, in full, because Title 18, United States Code, Section 1348 violates the First Amendment, both "as applied" to the conduct here and facially;

5)      Motion to dismiss, in part, because the Indictment fails to allege that any statements were made "in connection with the purchase or sale" of a security, as required under Title 18, United States Code, Section 1348(2);

6)      Motion to dismiss count 1 of the Superseding Indictment because it fails to allege that Rybarczyk was a member of any conspiracy (Title 18 United States Code Section 1349); and

7)      Motion to dismiss counts 16 (NAKD) and 17 (EXFL) of the Superseding Indictment because it fails to allege fraud against Rybarczyk.

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION .................................................................................................................... 1

I.    FACTUAL BACKGROUND ......................................................................................... 8

    A.    Overview of the Scheme .................................................................................. 8

    B.    Overview of the Defendants ........................................................................... 11

    C.    Specific Stocks ............................................................................................... 13

        1.    SXTC: September 11-14, 2020 ........................................................... 13

        2.    GTT – March 2021 .............................................................................. 14

        3.    UPC – July 2021 ................................................................................. 16

        4.    ABVC: August 11, 2021 ...................................................................... 18

II.    LEGAL STANDARDS .................................................................................................. 19

    A.    Motion to Dismiss the Indictment .................................................................. 19

    B.    The Charged Counts: Sections 1348 and 1349 .............................................. 20

III.    MOTION TO DISMISS, AT LEAST IN PART, THE ALLEGATIONS IN THE
    INDICTMENT CONCERNING "SCALPING," BECAUSE RYBARCZYK HAD NO
    DUTY TO DISCLOSE HIS STOCK SALES. ............................................................... 22

    A.    Rybarczyk had no "duty" to tell his Twitter followers when he will sell his
        shares or when he has an intent to sell. ............................................................ 23

    B.    SEC and statutory stock purchase and sale disclosure rules already in place
        further confirm that neither Rybarczyk nor any of the other Defendants had
        a duty to disclose stock sales or an intent to sell .............................................. 27

    C.    Recent events make clear that the federal securities laws do not mandate
        disclosure of stock sales by non-insider individuals who promote securities
        without compensation. ...................................................................................... 29

IV.    MOTION TO DISMISS FOR FAILURE TO ALLEGE THE MATERIALITY OF
    THE ALLEGED MISSTATEMENTS AND OMISSIONS IN THE INDICTMENT. ..... 35

    A.    Using ABVC as an example, the Indictment fails to allege that anyone
        actually relied on Rybarczyk's tweets to make trading decisions. ...................... 36

B.    The Indictment fails to allege how the context in which the statements were made—on Twitter and Discord by non-insiders with no connection to the companies—rendered the statements (or omissions) material.............................. 37

C.    Rybarczyk's statements and omissions as alleged in the Indictment were not material as a matter of law to the underlying stock trades entered into by the "victims."................................................................................................... 38

D.    The Tweets are not Material Because They Constitute Opinion Statements and Lawful Puffery. ........................................................................... 41

E.    Many of the tweets and statements alleged in the Indictment could not have influenced anyone's decision to trade.................................................... 42

V.    MOTION TO DISMISS THE INDICTMENT ON THE GROUNDS THAT RYBARCZYK HAD NO NOTICE THAT SECTION 1348 AFFIRMATIVELY REQUIRED HIM TO DISCLOSE HIS STOCK SALES ON TWITTER. ...................... 43

A.    Legal Standards of "Fair Notice" Doctrine....................................... 43

B.    Section 1348 is so vague and overbroad "that men of common intelligence must necessarily guess at it's meaning and differ to its application." .................. 45

C.    No prior judicial decisions or securities disclosure rules informed Rybarczyk that his charged conduct—an alleged failure to disclose his stock sales and intent to sell on Twitter—would be within the scope of Section 1348................ 46

D.    The "Time-Honored" Rule of Lenity Requires Dismissal of the Indictment. ...... 50

VI.    INDICTMENT SHOULD BE DISMISSED BECAUSE IT VIOLATES THE FIRST AMENDMENT, BOTH "AS-APPLIED" TO THE CONDUCT HERE AND FACIALLY.................................................................................................... 51

A.    Section 1348 is unconstitutional "as applied" to the conduct of Rybarczyk and his co-Defendants as alleged in the Indictment.............................. 51

B.    Section 1348 is facially overbroad as a substantial amount of protected speech will be chilled by its enforcement. ....................................................... 55

VII.    MOTION TO DISMISS TITLE 18, UNITED STATES CODE, SECTION 1348(2) FOR FAILURE TO ALLEGE THAT THE SOCIAL MEDIA POSTS WERE "IN CONNECTION WITH" A SECURITIES TRANSACTION.......................................... 57

VIII.    MOTION TO DISMISS COUNTS 16 (NAKD) AND 17 (EZFL) FOR FAILURE TO ALLEGE FRAUD AGAINST RYBARCZYK. ................................................. 59

ii

IX.      MOTION TO DISMISS COUNT 1 – TITLE 18, UNITED STATES CODE, SECTION 1349 - FOR FAILURE TO ALLEGE THAT RYBARCZYK WAS A MEMBER OF ANY CONSPIRACY ............................................................................................... 60

CONCLUSION ............................................................................................................. 62

iii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arruda v. Curves Int'l,*
    861 Fed. Appx. 831 (5th Cir. 2021 ................................................................. 23

*Ashcroft v. American Civil Liberties Union,*
    535 U.S. 564 (2002).......................................................................................... 52

*Ashcroft v. American Civil Liberties Union,*
    542 U.S. 656 (2004).......................................................................................... 52

*Basic v. Levinson,*
    485 U.S. 224 (1988).......................................................................................... 48

*Bd. of Trs. of the State Univ. of N.Y. v. Fox,*
    492 U.S. 469 (1989).......................................................................................... 52

*Boyce Motor Lines, Inc. v. United States,*
    342 U.S. 337 (1952).......................................................................................... 20

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) ........................................................................... 50

*Chiarella v. United States,*
    445 U.S. 222 (1980)................................................................................... 23, 47

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)............................................................................................ 45

*Dunn v. United States,*
    442 U.S. 100 (1979).......................................................................................... 43

*Evergreen Ass'n v. City of New York,*
    740 F.3d 233 (2d Cir. 2014)............................................................................. 54

*F.C.C. v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012).......................................................................................... 44

*Ganske v. Mensch,*
    480 F. Supp. 3d 542 (S.D.N.Y. 2020).............................................................. 37

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972).......................................................................................... 55

*In re Ames Dep't Stores Inc. Stock Litig.,*
    991 F.2d 953 (2d Cir. 1993)............................................................................. 58

iv

*Liparota v. United States*,
   471 U.S. 419 (1985).................................................................................... 44

*Lormand v. US Unwired, Inc.*
   565 F.3d 228 (5th Cir. 2009) ...................................................................... 42

*Neder v. United States*,
   527 U.S. 1 (1999)............................................................................. 21, 35, 48

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 174 (2015) .................................................................................... 41

*Reynolds v. E. Dyer Dev. Co.*,
   882 F.2d 1249 (7th Cir. 1989) ...................................................................... 6

*Russell v. United States*,
   369 U.S. 749 (1962).................................................................................... 20

*S.E.C. v. Blavin*,
   557 F.Supp. 1304 (E.D.  Mich. 1983).......................................................... 26

*S.E.C. v. Capital Gains Research Bureau, Inc.*
   375 U.S. 180 (1963)........................................................................ 23, 24, 26

*S.E.C. v. Fiore*,
   416 F. Supp. 3d 306 (S.D.N.Y. 2019)........................................................... 25

*S.E.C. v. Park*,
   99 F. Supp. 2d 889 (N.D. Il. 2000) ....................................................... 24, 25

*S.E.C. v. Pirate Inv'r LLC*,
   580 F.3d 233 (4th Cir. 2009) ...................................................................... 58

*S.E.C. v. Texas Gulf Sulphur Co.*,
   401 F.2d 833 (2d Cir. 1968)......................................................................... 58

*Sanabria v. United States*,
   437 U.S. 54 (1978)...................................................................................... 20

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000)......................................................................... 58

*Serafine v. Branaman*,
   810 F.3d 354 (5th Cir. 2016) ...................................................................... 51

*Slattery v. Cuomo*,
   531 F. Supp. 3d 547 (N.D.N.Y. 2021) .......................................................... 54

*TSC Industries, Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976) ............................................................................... 35

*Turner Broad. Sys. v. FCC,*
   512 U.S. 622 (1994) ............................................................................... 54

*United States v. Baker,*
   912 F.3d 297 (5th Cir. 2019) ................................................................. 21

*United States v. Baker,*
   923 F.3d 390 (5th Cir. 2019) ................................................................. 21

*United States v. Baker,*
   No. A-13-CR-346-SS, 2017 WL 4853811 (W.D. Tex. Oct. 26, 2017) ................................. 21

*United States v. Bieganowski,*
   313 F.3d 264 (5th Cir. 2002) ................................................................. 35

*United States v. Bogucki,*
   No. 18-CR-00021-CRB-1, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ................................. 5

*United States v. Brooks,*
   681 F.3d 678 (5th Cir. 2012) ................................................................. 57

*United States v. Causey,*
   No. CRIM. H-04-025-SS, 2005 WL 2647976 (S.D. Texas 2005) ..................................... 35

*United States v. Clinical Leasing Serv., Inc.,*
   925 F.2d 120 (5th Cir. 1991) ................................................................. 44

*United States v. Coffman,*
   94 F.3d 330 (7th Cir.1996) ................................................................. 39

*United States v. Colton,*
   231 F.3d 890 (4th Cir. 2000) ................................................................. 39

*United States v. Cooper,*
   38 F.4th 428 (5th Cir. 2022) ................................................................. 50

*United States v. Correia,*
   55 F.4th 12 (1st Cir. 2022) ................................................................. 41

*United States v. Coscia,*
   866 F.3d 782 (7th Cir. 2017) ................................................................. 21

*United States v. Dauray,*
   215 F.3d 257 (2d Cir. 2000) ................................................................. 46

*United States v. Davis*,
  No. 13-CR-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) .................................... 38

*United States v. Delaughter*,
  No. 3:09-002GHD-SAA-2, 2009 WL 1424424 (N.D. Miss. May 18, 2009) ........................... 19

*United States v. Evans*,
  892 F.3d 692 (5th Cir. 2018) .................................................................................................. 35

*United States v. Fontenot*,
  665 F.3d 640 (5th Cir. 2011) .................................................................................................. 59

*United States v. Gaspard*,
  744 F.2d 438 (5th Cir. 1984) .................................................................................................. 23

*United States v. Gonzalez*,
  686 F.3d 122 (2d Cir. 2012) .............................................................................................. 19, 20

*United States v. Grant*,
  683 F.3d 639 (5th Cir. 2012) .................................................................................................. 60

*United States v. Guzman-Ocampo*,
  236 F.3d 233 (5th Cir. 2000) .................................................................................................. 19

*United States v. Harris*,
  821 F.3d 589 (5th Cir. 2016) .............................................................................................. 21, 23

*United States v. Hatfield*,
  724 F. Supp. 2d 321 (E.D.N.Y. 2010) .................................................................................... 21

*United States v. Hogue*,
  132 F.3d 1087 (5th Cir. 1998) ................................................................................................ 20

*United States v. Kay*,
  359 F.3d 738 (5th Cir. 2004) .................................................................................................. 19

*United States v. Lanier*,
  520 U.S. 259 (1997) ................................................................................................ 43, 44, 47

*United States v. Lawrence*,
  727 F.3d 386 (5th Cir. 2013) .................................................................................................. 59

*United States v. Madaio*,
  656 Fed. Appx. 685 (5th Cir. 2016) ........................................................................................ 22

*United States v. Mahaffy*,
  693 F.3d 113 (2d Cir. 2012) .................................................................................................... 21

vii

*United States v. Martinelli*,
   454 F.3d 1300 (11th Cir. 2006) ..................................................... 41

*United States v. Motz*,
   652 F. Supp. 2d 284 (E.D.N.Y. 2009) .......................................... 21

*United States v. Nides*,
   No. CIRM.A. 14-40, 2014 WL 2894281 (E.D. La. June 26, 2014) ........................................ 19

*United States v. Perez-Ceballos*,
   907 F.3d 863 (5th Cir. 2018) ..................................................... 22

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000)........................................................ 20

*United States v. Radley*,
   632 F.3d 177 (5th Cir. 2011) ..................................................... 22

*United States v. Radley*,
   659 F. Supp. 2d 803 (S.D. Tex. 2009) .......................................... 21

*United States v. Radley*,
   659 F. Supp. 2d 803 (S.D. Texas 2009) ........................................ 41

*United States v. Rodriguez*,
   732 F.3d 1299 (11th Cir. 2013) ................................................... 41

*United States v. Scruggs*,
   714 F.3d 258 (5th Cir. 2013) ..................................................... 55

*United States v. Scully*,
   951 F.3d 656 (5th Cir. 2020) ..................................................... 21

*United States v. Shelton*,
   669 F.2d 446 (7th Cir. 1982) ..................................................... 41

*United States v. Simpson*,
   741 F.3d 539 (5th Cir. 2014) ..................................................... 22

*United States v. Sneed*,
   No. 3:19-CR-0580-B, 2022 WL 35801 (N.D. Tex. Jan. 4, 2022) .......................................... 41

*United States v. Stevens*,
   559 U.S. 460 (2010).......................................................... 55, 56

*United States v. Weimert*,
   819 F.3d 351 (7th Cir. 2016) .................................................. 38, 39

viii

*USA v. Bogucki*,
    No. 18-CR-00021-CRB-1, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ............................... 40

*Winters v. New York*,
    333 U.S. 507 (1948) ................................................................................................................ 45

*Zweig v. Hearst Corp.*,
    594 F.2d 1261 (9th Cir. 1979) ......................................................................................... 24, 26

**Other Authorities**

15 U.S.C § 78(j)(b) .......................................................................................................................... 57

15 U.S.C. § 77q .............................................................................................................................. 28

15 U.S.C. § 78j .............................................................................................................................. 46

17 C.F.R. § 240.10b-5 .................................................................................................................... 46

17 C.F.R. § 240.13d-2 .................................................................................................................... 28

18 U.S.C § 1344(1) ........................................................................................................................ 22

18 U.S.C § 1348 ........................................................................................................................ passim

18 U.S.C § 1349 ................................................................................................................... 8, 22, 35

Fed. R. Crim. P. 12(b)(3)(B) .......................................................................................................... 20

Fed. R. Crim. P. 7(c)(1) ................................................................................................................. 19

Elisabeth Bumiller, *Corporate Conduct: The President; Bush Signs Bill Aimed at Fraud In Corporations*, THE NEW YORK TIMES (July 31, 2002),
    https://www.nytimes.com/2002/07/31/business/corporate-conduct-the-president-bush-signs-bill-aimed-at-fraud-in-corporations.html .................................................................................. 49

Elliott Laybourne, *LUNA Price Explodes 80% After Novogratz Pumps Terra Coin on Twitter*, INVESTINGCUBE (Aug. 19, 2021), https://tinyurl.com/3varh3v4. ....................................... 29

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearings Before the House Committee on Financial Services*, 117th Cong. (2021) (testimony of Keith Gill), available at
    https://docs.house.gov/meetings/BA/BA00/20210218/111207/HHRG-117-BA00-Wstate-GillK-20210218.pdf ................................................................................................................. 3

Gregory Zuckerman and Justin Baer, *Mike Novogratz's Crypto Comeback Faces a Trial By Fire*, WALL ST. J. (June 4, 2022, 12:00 AM), https://tinyurl.com/7raszcc7 .......................... 29

*Insider Transactions and Forms 3, 4, and 5,* INVESTOR.GOV, https://www.sec.gov/files/forms -3-4-5.pdf (last visited May 11, 2023) ................................................................................ 28

*Investor Alert: Beware of Stock Recommendations on Investment Research Websites,* INVESTOR.GOV (Apr. 10, 2017), https://www.investor.gov/introduction-investing/general -resources/news-alerts/alerts-bulletins/investor-alerts/investor-4 ............................................ 26

John McDermott, *How WallStreetBets Redditors Used Their Collective Power to Manipulate the Stock Market,* ESQUIRE (Jan. 27, 2021), https://www.esquire.com/news-politics/a35339535/game-stop-stock-short-squeeze-explained/. ................................................. 2

Kevin Sankiewicz, *Ex-SEC Chief: Reddit-Fueled GameStop Frenzy Was Not a Modern-Day Pump-and-Dump Scheme,* CNBC (Feb. 19, 2021). https://www.cnbc.com/2021/02/19/jay-clayton-reddit-fueled-gamestop-frenzy-not-a-pump-and-dump-scheme.html.(Jay Clayton rejected argument that coordinated group buying in GameStop was an illegal pump and dump). .................................................................................................................................... 2

Kollen Post, *Federal Attorneys Are Investigating Meme-led Trading in GME, AMC, and Silver: WSJ,* COINTELEGRAPH (Feb. 11, 2021), https://cointelegraph.com/news/federal-attorneys-are-investigating-meme-led-trading-in-gme-amc-and-silver-wsj; Michelle Celarier, *DOJ Short Seller Probe Fails to Silence Activist,* INSTITUTIONAL INVESTOR (Dec. 21, 2021), https://www.institutionalinvestor.com/article/b1vzp0n3yccl2g/DOJ-Short-Seller-Probe-Fails-To-Silence-Activists. ........................................................................................................................ 1

*Legislative History of Title VIII of HR 2673: The Sarbanes-Oxley Act of 2002,* GOV'T. PUBLISHING OFFICE (July 26, 2002), https://www.govinfo.gov/content/pkg/CREC-2002 -07-26/html/CREC-2002-07-26-pt1-PgS7418.htm. ............................................................... 56

Makena Kelly, *Hill Report: Who Wants to Talk to Reddit?,* THE VERGE (Feb. 18, 2021), https://www.theverge.com/2021/2/18/22290110/house-financial-services-robinhood-gamestop-squeeze-roaringkitty-hearing ................................................................................ 2

Matthew Goldstein and Kate Kelly, *Melvin Capital, Hedge Fund Torpedoed By the GameStop Frenzy, is Shutting Down,* NEW YORK TIMES (May 18, 2022) https://www.nytimes.com/2022/05/18/business/melvin-capital-gamestop-short.html#:~:text=It%20was%20propped%20up%20by,fresh%20capital%20from%20new %20investors. ............................................................................................................................ 1

Rodney Holmes, *Galaxy Digital Lost $544 Million After Fall of Terra (LUNA), Bitcoin and Other Cryptocurrencies,* CRYTOSAURUS (Aug. 8, 2022), https://crypasaurus.tech/galaxy-digital-lost-544-million-after-fall-of-terra-luna-bitcoin-and-other-cryptocurrencies/ ............. 30

Samir Doshi, *The Timing of Schedule 13D,* HARV. LAW SCHOOL FORUM ON CORP. GOV. (June 23, 2019), https://corpgov.law.harvard.edu/2019/06/23/the-timing-of-schedule-13d/#:~:text=In%20keeping%20with%20congressional%20intent,less%20than%20ten%

20calendar%20days. .............................................................................................................. 28

*Saved by the Bell*, WIKIPEDIA.COM, https://en.wikipedia.org/wiki/Saved_by_the_Bell
(last visited May 11, 2023) .............................................................................. 11

*Tips for Checking out Newsletters*, SEC.GOV (Feb. 27, 2009),
https://www.sec.gov/investor/pubs/cyberfraud/newsletter.htm................................. 52

TWITTER, https://twitter.com/search?q=%24GTT%20until%3A2021-03-04%20since%3
A2021-02-24&src=typed_query&f=live (last visited May 11, 2023).................................... 16

U.S. Const. amend. V................................................................................................. 43

*Updated Investor Alert: Social Media and Investing – Avoid Fraud,* SEC.GOV
(Nov. 12, 2014), https://tinyurl.com/2p8t7shd........................................................ 53

**<u>INTRODUCTION</u>**

The origin of this case is the now legendary Gamestop retail investor-fueled short squeeze of January 2021. Egged on by social media—most specifically the subreddit of r/WallStreetBets on the "Reddit" social media platform—retail investors banded together and repeatedly touted Gamestop (GME), which, was trading at a few dollars per share just weeks before the squeeze. Because of its financial problems, GME was being heavily shorted by hedge funds and others, who were predicting that the price would further decline. Retail traders, colluding together in online forums, seized on this short-interest and effected a massive squeeze, forcing the "shorts"—*i.e.* hedge funds—to cover their positions at ever increasing prices. As a result, the price of Gamestop—soon followed by other meme stocks such as AMC—skyrocketed virtually overnight to nearly $500/share, making some retail traders very wealthy.

Predictably, the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") began an investigation into this online retail trading frenzy,[1] which necessitated a multi-billion dollar bailout of the hedge fund Melvin Capital, one of the major "short" hedge funds that lost an astonishing $2.75 billion on its GME bet.[2] Even Congress took interest, with

---

[1] *See, e.g.*, Kollen Post, *Federal Attorneys Are Investigating Meme-led Trading in GME, AMC, and Silver: WSJ,* COINTELEGRAPH (Feb. 11, 2021), https://cointelegraph.com/news/federal-attorneys-are-investigating-meme-led-trading-in-gme-amc-and-silver-wsj; Michelle Celarier, *DOJ Short Seller Probe Fails to Silence Activist,* INSTITUTIONAL INVESTOR (Dec. 21, 2021), https://www.institutionalinvestor.com/article/b1vzp0n3yccl2g/DOJ-Short-Seller-Probe-Fails-To-Silence-Activists.

[2] *See, e.g.*, Matthew Goldstein and Kate Kelly, *Melvin Capital, Hedge Fund Torpedoed By the GameStop Frenzy, is Shutting Down,* NEW YORK TIMES (May 18, 2022) https://www.nytimes.com/2022/05/18/business/melvin-capital-gamestop-short.html#:~:text=It%20was%20propped%20up%20by,fresh%20capital%20from%20new%20investors.

the House Financial Services Committee holding hearings just a month after the squeeze.[3] But

there was a fundamental problem with the investigations: what the retail traders were doing in

banding together and driving up the price of meme stocks was not illegal. As John McDermott

explained in a January 27, 2021, Esquire article titled "How WallStreetBets Redditors Used

Their Collective Power to Manipulate the Stock Market":[4]

> On its face, the GameStop surge appears to be a classic pump-and-dump scheme,
> in which a group of people collude to hype up a stock, artificially increase its
> share price and then sell at a profit. There have been talks about the Securities
> Exchange Commission coming down on WallStreetBets and other online stock
> forums, but the tricky part is there is no evidence of fraud or insider trading. All
> of this information is being exchanged in the open, on a public forum. There's no
> law against a group of investors taking the same position in a stock, even if
> they're doing it as a massive troll.

Even Jay Clayton, the former chairman of the SEC, concurred that the retail trading

frenzy that skyrocketed the price of Gamestop was not illegal, explaining in interviews that:

"people were very transparent about what they were doing and why they were doing it, which

was fairly interesting."[5] And when it came time to testify before Congress, Keith Gill, a

prominent member of WallStreetBets who was one of original pumpers of Gamestop, fiercely

defended his actions:

---

[3] *See, e.g.*, Makena Kelly, *Hill Report: Who Wants to Talk to Reddit?,* THE VERGE (Feb. 18,
2021), https://www.theverge.com/2021/2/18/22290110/house-financial-services-robinhood-
gamestop-squeeze-roaringkitty-hearing (summarizing February 18, 2021 hearing on Gamestop
short squeeze).

[4] *See* John McDermott, *How WallStreetBets Redditors Used Their Collective Power to
Manipulate the Stock Market,* ESQUIRE (Jan. 27, 2021), https://www.esquire.com/news-
politics/a35339535/game-stop-stock-short-squeeze-explained/.

[5] *See* Kevin Sankiewicz, *Ex-SEC Chief: Reddit-Fueled GameStop Frenzy Was Not a Modern-
Day Pump-and-Dump Scheme*, CNBC (Feb. 19, 2021). https://www.cnbc.com/2021/02/19/jay-
clayton-reddit-fueled-gamestop-frenzy-not-a-pump-and-dump-scheme.html.(Jay Clayton
rejected argument that coordinated group buying in GameStop was an illegal pump and dump).

I've been asked why I decided to share my investment ideas on social media. My investment skills had reached a level where I felt sharing them publicly could help others. I also thought that by sharing my own ideas and accepting critiques, I would be able to identify holes in my analysis. Hedge funds and other Wall Street firms have teams of analysts working together to compile research and critique investment ideas, while individual investors have not had that advantage. Social media platforms like YouTube, Twitter, and WallStreetBets on Reddit are leveling the playing field. And in a year of quarantines and COVID, engaging with other investors on social media was a safe way to socialize. We had fun.[6]

The SEC and DOJ seem to agree that no laws had been broken in the Gamestop squeeze. The report on Gamestop published by the SEC in October 2021 identified no violations of the 1933 or 1934 Acts.[7] And the DOJ did not charge anyone criminally with a "pump-and-dump" scheme. But in their quest to clamp down on social media chatter and group purchasing of meme stocks—perhaps to protect the hedge funds and others who short stocks—regulators have not given up, and this case here is a result of those efforts. Applying a rarely used legal theory typically reserved for fiduciaries and others in positions of trust—an alleged failure to disclose stock sales while touting a stock— regulators have resorted to a new and untested weapon, Title 18 U.S.C § 1348 (hereinafter, "Section 1348") which is a vague, amorphous, and seldom used statute implemented just 20 years ago in reaction to the Enron scandal's *corporate fraud*.

This case concerns whether—using the broad and novel Section 1348 framework — social media posts of users with ironic (and even goofy) monikers who promoted stocks online,

---

[6] *See* Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearings Before the House Committee on Financial Services, 117th Cong. (2021) (testimony of Keith Gill), available at https://docs.house.gov/meetings/BA/BA00/20210218/111207/HHRG-117-BA00-Wstate-GillK-20210218.pdf.

[7] *Staff Report on Equity and Options Market Structure Conditions in Early 2021,* SEC (Oct. 14, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.

can constitute an illegal scheme to defraud Twitter followers when a.) the Defendants did not

fabricate fake articles about the stocks, b.) were not corporate insiders, c.) did not hold

themselves out as trustworthy experts, and d.) did not hide their incentives to "pump stocks,"

simply because the Defendants did not provide real time updates on their trading positions as

they discussed the stocks. Put bluntly, what Rybarczyk (and the other Defendants) did was not

criminal, and for multiple independent reasons articulated below, the Superseding Indictment

("Indictment" or "Ind.") must be dismissed.

### No Duty to Update

**First,** Rybarczyk had no duty to update any social media follower about his trades. The

Government's theory of the case hinges almost on its entirety on the fraud of "scalping" a stock:

where one recommends a stock without disclosing present or future intended sales of the stock.

Historically, the Government has pursued scalpers who had (1) an independent disclosure duty,

such as an investment advisor or financial columnist and (2) not disclosed their interest in the

stock, thus making them appear unbiased and hiding their true incentives to tout the stock. Here,

in contrast, the Government is attempting to stretch this fraud beyond its well-established limits

by pursuing non-professional meme traders who actively disclaim any reliance on their social

media posts, and who also make their trading incentives clear. Indeed, consistent with the

unserious nature of their social media posts, Defendants shared copious evidence of their

luxurious lifestyles, which could *only* have been funded by their profitable day trading.

### Posts Not Material

**Second,** Rybarczyk's posts were not material or capable of having a reasonable person

rely on them. Even setting aside the common-sense points about Defendants' silly names—

Rybarczyk was called "Ultra_Calls"—and their transparency in the stocks they owned, the

4

Indictment (and its omissions, ironically) offers clues about how little Defendants moved the market. An example, the Government claims Rybarczyk "pumped and dumped" ABVC, but fails to mention that ABVC's price had actually *declined* from the time of Rybarczyk's first tweet concerning ABVC as alleged in the Indictment. But more fundamentally, the Government is unable to show any misrepresentation that goes to the "benefit of the bargain" any alleged "victim" struck when buying or selling a stock. Like Rybarczyk, the "victims" knew the stock's price, its quantity, and its recent price movements—the "pump." It does not matter if Rybarczyk's social media followers would not have bought the stock had they known about Rybarczyk's specific sales—his representations concerning collateral issues such as his intent did not change the terms of the purchase or sale of a stock on the open market. It is not fraud in an arms-length transaction to tell someone you have one position (such as being long), when really you have another (like being short). *See, e.g., United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959, at *5 (N.D. Cal. Mar. 4, 2019). And the irrelevance of Rybarczyk's opinion and puffing statements—such as future price predictions ("90% of swings all explode")—are even more readily apparent and categorically nonactionable.

### *Void for Vagueness*

**Third,** and as an unsurprising conclusion from the ample case law that supports Rybarczyk's arguments on the merits, he could not have had proper notice that this conduct was unlawful under Section 1348. Again, based on case law that acknowledges the common-sense conclusion that not every misrepresentation is criminal—such as making a "final offer" during negotiations that is not truly a "final offer"—Rybarczyk had no reason to think he had to be unfailingly scrupulous and transparent in his pseudo-anonymous meme Twitter and Discord accounts. The fact that the Government asserts that Section 1348 covers *any* misrepresentation

5

made to *any* person, in a way no one could have expected, shows that the statute is effectively limitless in its applications and must therefore be held as being void for vagueness.

### *Violation of First Amendment Rights*

**Fourth**, this prosecution infringes on Rybarczyk's First Amendment rights, both "as-applied" to the conduct here and facially. People should be allowed to discuss stocks, share subjective opinions, and trade based on what they are seeing without fear that they could be criminally prosecuted if they sell a stock they happened to be publicly positive about in the past. This standard, especially when coupled with the fact that Section 1348 does not even require a scheme intended to obtain money or property, provides an impossible framework to guide conduct. How long after a positive tweet does one have to sit on the tweet and not trade, even in the face of a rapid price decline? What if someone likes a stock but needs money to buy a house or meet a capital call and therefore sells the stock—are they fraudsters? Put simply, under the Government's theory of criminal liability, speech undoubtedly will be chilled because market participants will not know what is or is not illegal. To be sure, it might be convenient if Section 1348 captured whatever conduct the prosecutors considered illegal that day, and that might have been what its drafters hoped for, but that does not make the statute constitutional in its application. Whatever rulemaking powers the SEC has to define the contours of securities fraud civilly through enforcement actions, criminal prosecutions, where a person's liberty is at stake, cannot. *Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) ("federal judges [are not] in the business of creating what in effect would be common law crimes") (internal quotation marks omitted). In addition, Section 1348 is facially invalid because, for these same reasons, it unduly prohibits a significant amount of First Amendment protected speech.

### *Statements Not Made in Connection with Security Purchase*

6

*Fifth*, all charges premised on Section 1348(2) must be dismissed because the Government cannot meet the requirement to show that any statement made by Rybarczyk was made *in connection with* a purchase and sale of a security, because the statements were not made in a document or medium that *any* investor would presumably rely. The social media posts were not made in a prospectus or offering memoranda, or even in an official corporate press release or company Twitter account. The statements, as alleged, were made by Twitter randoms who operated meme accounts in the names of fictional characters.

### *Fails in Alleged Fraudulent Details*

*Sixth*, for two of the alleged counts (16 (NAKD) and 17 (EZFL)), the Government fails to provide *any* detail at all as to why the trading was fraudulent, thereby failing to apprise Rybaczyk of what he needs to prepare a defense. The Government simply includes the name of the security, the Defendants charged in the count, and the approximate dates of the fraud, but without any details necessary to determine if the claim is based on an affirmative misstatement, an omission of intent, or something else entirely. These counts must be dismissed.

### *Rybarczyk is Not a Co-Conspirator*

*Seventh*, the Government wrongfully includes Rybarczyk in a conspiracy count despite the fact that he was not part of the Atlas Trading Discord during the relevant period and there are no allegations in the Indictment indicating that he engaged in any type of criminal agreement with any of the other Defendants.

For all these reasons, either together or separately, charges against Rybarczyk should be dismissed. Accompanying this memorandum of law and motions is a chart, Exhibit A, listing out each statement alleged in the superseding indictment, together with the reasons—linked to this

memorandum of law for the "duty to disclose" and "materiality" arguments—for why the statement is not criminal.[8]

## I.   FACTUAL BACKGROUND

The superseding indictment (Dkt. 134, "Indictment" or "Ind.") charges Rybarczyk, together with seven co-Defendants, with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C § 1349 (hereinafter, "Section 1349"), and six substantive counts of securities fraud, in violation of Section 1348.

### A.   Overview of the Scheme

The Indictment alleges that from January 2020 to April 2022, Rybarczyk and his co-Defendants engaged in a scheme to "pump and dump" securities based on "false and misleading information and material omissions about those securities …." Ind. ¶1. Although the Indictment alleges that the Defendants held themselves out as "skilled stock traders," the Indictment does *not* contend that any of the Defendants worked at a bank or financial firm, were company insiders or directors, or even that they put out "false and misleading information and material omissions" through a platform that was designed to make those statements appear to be legitimate. Instead, the Indictment alleges that the Defendants published the allegedly fraudulent information "on [free] *social media platforms*, including Twitter, Inc. and Discord, Inc." *Id.* ¶1.[9]

---

[8] Exhibit A discusses the Indictment's statements of Rybarczyk (as well as Cooperman and Deel, who join in the motion) only in relation to the "duty to disclose" and "materiality" arguments contained in this memorandum of law because the other arguments apply to either the entirety of the Indictment or to specific counts within the Indictment.

[9] Twitter is a social media platform that allows users to send and receive messages called "tweets" that are limited to 280-characters and which can include text, photos, videos, and links to other websites. Tweets are not fact-checked or verified before they are published on Twitter, and in fact, the brevity of Tweets makes it difficult for users to fully explain complex issues, leading to oversimplification and misinterpretation. Discord, conversely, is a communications platform that was designed for creating online communities, allowing users to communicate with one another through voice, video and text chat. In addition to having private messaging features,

To carry out this purported securities fraud scheme, Rybarczyk, together with others, first "purchase[d] shares of securities," then, the Defendants "posted messages on social media platforms with false, positive information about the security," to include, "among other things, the Defendants' position in the security, how long the Defendants intended to hold the security, the Defendants' view that the security would increase in price, and the price the security could reach," presumably in the future. *Id.* ¶1.[10] The purpose of these social media posts was, as alleged, to "induce other investors to buy the security and artificially drive up its price." *Id.* Then, once the price increased, the Defendants "secretly sold their own shares of the security at a higher price to secure a profit for themselves, at or around the time they posted messages to induce other investors to purchase the same security and concealed their intent to sell." *Id.*

The body of the Indictment provides additional detail on the Defendants' alleged securities fraud scheme, which, as noted, began with the open market purchase of a security— sometimes together with others—followed by the "pump" of that security, which would be done, as alleged, by posting "false and misleading messages," on the following general topics: 1) representations that a defendant intended to hold a security, including by engaging in a "swing" trade (described as a longer-term trade) a opposed to a day trade; 2) representations that a defendant 'joined' another defendant in purchasing a security; 3) representations concerning a

---

Discord allows users to create and join servers, which are chat rooms where members can discuss various topics such as, in this case, stocks. Both platforms do not charge everyday users.

[10] Notably, although the Indictment characterizes the Defendants as putting out "false, positive information" about securities (Ind. ¶1), the Indictment correctly does not categorize this "false … information" as being *factual* information. This is because, amongst other things, three out of the four examples that the Indictment provides in its first paragraph—how long the Defendants *intended* to hold a security, the price the security *could* reach, and the Defendants' *view* that the security would increase in price (Ind. ¶1)—concerned either Defendants' future intent or their opinion on how a stock will perform in the future, all of which are incapable of being proven true or false.

price target for the security that was significantly higher than the current price and was higher than what the Defendants "actually valued" the security at; and, 4) representations concerning "due diligence" and other catalysts that would "increase the security's price over time." *Id.* ¶13.

These messages were "false and misleading," the Indictment alleges, not because the content was in and of itself false, but because the Defendants concealed their "intent to use these messages to induce other investors to purchase the securities so that Defendants could sell their shares at a higher price at and around the time of the messages." *Id.* ¶14. Put differently, the "defendants sought to conceal from, and further mislead, their Twitter followers and members of Atlas Trading Discord about the Defendants' true trading positions and intentions," and in doing so, induced Twitter users to "purchase and hold the same securities that the defendants were selling or dumping so that the defendants could maximize their own profits." *Id.*

The Indictment then provided a number of purported examples of allegedly false representations by the Defendants concerning their sales of shares and their "scalping" of short-term profits.[11] *Id.* ¶15. Rybarczyk is not alleged to have made any of the false statements concerning those subjects. *Id.* ¶¶15- 19. There are no accusations in the Indictment that any of the Defendants were paid to promote or tout any stocks or engaged in any type of wash or match trading.

---

[11] "Scalping" in this context refers to a completely legitimate short-term day trading strategy where an investor buys and sells an individual stock multiple times throughout the day. *See, e.g.,* https://corporatefinanceinstitute.com/resources/wealth-management/scalping-day-trading-technique/. The goal of "scalping" is to make a small profit over many individual trades to take advantage of a stock's run-up in prices while limiting down-side risk. Scalping allows a trader to lock-in profits based on a stock's increase in value; that way, if a stock price collapses, the trader will have already reaped and realized significant upside.

B.      **Overview of the Defendants**

None of the Defendants are described in the Indictment as financial professionals working for legitimate (or even illegitimate) financial institutions or possessing any degree of financial expertise or acumen, securities licenses, or higher education. To the contrary, the Indictment describes all the Defendants as social media influencers who often used absurd or ridiculous social media handles to engage with the Twitter public. Ind. ¶¶2-9.

As an example, co-Defendant Constantin, allegedly used the Twitter account "@MrZack Morris," which had more than 500,000 followers, as well as the Discord account "Zack Morris#0001." Ind. ¶2. "Zack Morris" is a fictional 1990s television character from the hit series "Saved by the Bell," which chronicles the shenanigans of Morris and his friends who are all students at Bayside High, a fictional California high school.[12] According to the Indictment, Constantin co-founded Atlas Trading, a purported "stock trading community," and he "encouraged investors to join Atlas Trading's free chatroom or server on Discord purportedly to learn how to trade securities and receive "alerts" or messages from Constantin and others." *Id.* ¶2. Over time, more than 250,000 people joined the Atlas Trading Discord. *Id.*

Other Defendants include Daniel Knight, who used the Twitter account "@DipDeity" and purportedly had more than 175,000 followers. *Id.* ¶9. Knight too was a member of Atlas Trading Discord and he hosted a podcast—Pennies: Going in Raw—with defendant Hugh Hennessy, a New Jersey resident who Tweeted under the user name "@hugh_henne"; he had over 225,000 followers. *Id.* ¶8. Tommy Cooperman, a member of Atlas Trading Discord, resided in California and had more than 125,000 followers for his "@ohheytommy" Twitter account. *Id.*

---

[12] *Saved by the Bell*, WIKIPEDIA.COM, https://en.wikipedia.org/wiki/Saved_by_the_Bell (last visited May 11, 2023).

¶7. Gary Deel, also a member of Atlas Trading, had more than 145,000 followers for
"@notoriousalerts" and he used the Discord account "Mystic Mac #7345". *Id*. ¶5.

Rybarczyk, a resident of Texas, used the Twitter account "@Ultra_Calls" and had more
than 275,000 Twitter followers. *Id*. ¶4. Rybarczyk also used the Discord account "Ultra#0374."
The Indictment alleges that Rybarczyk was a member of the Atlas Trading Discord, but also
alleges that he "later started a similar trading chatroom on Discord named Sapphire Trading." *Id*.
¶4. In fact, Rybarczyk left Atlas Trading by October 2018, before the conspiracy is even alleged
to have even begun[13]

As noted, the Indictment alleges that the "defendants held themselves out" on social
media "as skilled stock traders." *Id*. ¶10. The Defendants did this, the Indictment asserts, by
"frequently" posting on Twitter "the profits of their trading activities." *Id*. Further, the
Defendants "also frequently posted pictures" on Twitter of "luxury residential properties,
vehicles, jewelry, and other luxury items." *Id*. And, the Indictment claims, the "defendants also
frequently encouraged investors to join Atlas Trading Discord purportedly so that other investors
could share in the Defendants' financial gains by trading securities." *Id*.

The Indictment does *not* allege that the Defendants held themselves out as financial
advisors who deceived their Twitter followers by making it appear that their investment advice
was unbiased and disinterested when in fact they were selling stocks that went against their own
recommendations. Instead, the Indictment makes clear that *anyone* following the Defendants

---

[13] *See, e.g.,* DOJ Production 2 Discord chat discovery (852719466886594630.csv), excerpted
below:

| 2021-06-11 01:24:40.576000+00:00 | Ultra#0374 | Sapphire is my room I left atlas in 2018 |

While Rybarczyk may have technically remained a "member" of Atlas Trading, as the
Indictment alleges, there were more 250,000 members, and certainly not every person was a co-
conspirator.

would have understood that: 1) the Defendants themselves held positions in the stocks that they were advocating for on Twitter, 2) the Defendants were actively selling their stocks to finance their luxurious lifestyles, 3) none of the Defendants were acting in the best interest of their Twitter followers in some type of fiduciary or position of trust capacity, and 4) the Defendants were *not* advocating a buy and hold strategy as part of a long-term investment portfolio. The Defendants were interested in short-term gains, as their Twitter posts made abundantly clear.

**C.    Specific Stocks**

The Indictment alleges illegal trading in 18 separate stocks. *See* Ind. Counts 2-20. Rybarczyk is alleged to have traded in six of those stocks: SXTC, GTT, UPC, ABVC, NAKD, and EZFL. *See* Counts 3 (SXTC), 7 (GTT), 12 (UPC), 13 (ABVC), 16 (NAKD) and 17 (EZFL). The Indictment contains no factual allegations or information concerning Rybarczyk's trading in NAKD (Count 16) and EZFL (Count 17), instead stating only that Rybarczyk committed securities fraud in those tickers in "September through October 2021." There *are* factual allegations concerning Rybarczyk's role in trading SXTC, GTT, UPC and ABVC, and those allegations are summarized below.

**1.    SXTC: September 11-14, 2020**

On Friday September 11, 2020, co-defendant Deel sent Rybarczyk a message stating that he purchased SXTC and planned to post about the stock on Monday, to which Rybarczyk responded: "Thanks bro … I'll add." Ind. ¶22. That day, both Rybarczyk and Deel purchased SXTC stock, 400,000 and 62,103 shares respectively, on the open market. *Id.*[14]

On Monday morning (September 14, 2020), Rybarczyk helped Deel compose a Tweet concerning SXTC and also promised Deel that he would re-tweet Deel's tweet *if* the stock price

_____

[14] For Rybarczyk's trading records concerning SXTC, *see generally* DOJ-PROD-0000164430 rows 200699 to 201198.

13

then declined. *Id*. ¶24 ("retweet … on the first dip" of SXTC"). The Tweet went live at 9:32 a.m.

*Id*. ¶26. There are no allegations that Rybarczyk instructed Deel to add anything false to the

tweet. The tweet stated that Deel had added SXTC (true), that SXTC was oversold (true), that

SXTC had recently been granted a Nasdaq extension (true), that insiders owned 51% of the stock

(true), and that it was set for a "big runner" (now known to be true, but at the time it was an

opinion). *Id*. ¶26; *see* Dkt. 238 at 5-6 (Rybarczyk's memorandum of law describing how Deel's

SXTC tweet was accurate). While the Government alleges that this tweet was "false and

misleading," this allegation appears to be because Deel had "omitted [in the tweet] that he

intended to sell his own shares in SXTC." *Id*. Likewise, the Indictment takes issue with

Rybarczyk's post on social media, shortly after Deel's tweet, that he too had both "added" (true)

and was "[a]dding" SXTC—which he *had* done by purchasing 400,000 shares of SXTC— but

concealed the fact that he began selling SXTC shortly thereafter (Rybarczyk sold all 400,000

shares between 9:35 a.m. and 10:29 a.m.). *Id*. ¶28. According to the Indictment, Deel, Matlock

(who also purchased and sold shares while allegedly concealing his intent to sell) and Rybarczyk

profited approximately $19,323.83 in total from their "pump and dump" of SXTC. *Id*. ¶¶21, 29,

31.

## 2.   GTT – March 2021

The Indictment alleges that by approximately 1:37 p.m. on March 1, 2021, Rybarczyk,

Deel, Cooperman and Knight had collectively purchased 301,300 shares of GTT at an average

price of $1.76. Ind. ¶44.

Although the Indictment makes it appear that this was some type of long-term plan to

accumulate stock, in fact, trading records provided by the Government in discovery show that

Rybarczyk placed his first order to purchase GTT stock (200,000 shares at a price of

approximately $1.71/share) at 1:26 p.m. that same day, and his second order to purchase GTT

14

stock (75,000 shares at a price of approximately $1.84/share) was placed minutes later, at 1:32 p.m.[15]

Five minutes after placing his second order for GTT, at 1:37 p.m., Rybarczyk sent a Tweet concerning GTT—"$GTT 24RSI +++ major multi billion $$$ catalyst"—while allegedly "omitting the material information that he intended to sell his own shares of GTT." Ind. ¶45. Within minutes of the tweet, Cooperman, Knight and Deel sold 35,750 shares of GTT, earning less than $2,000. *Id*. ¶45. Rybarczyk himself put in sell orders where he sold small quantities of his shares: 50,000 shares at 1:49 p.m. at a price of approximately $1.92/share; 25,000 shares at 2:00 p.m. at a price of approximately $1.88/share; 25,000 shares at 2:13 p.m. at a price of approximately $1.79 (at this time, the price was below that of Rybarczyk's purchase of shares at 1:32 p.m.). These sales still left Rybarczyk holding 175,000 shares. At approximately 3:50 p.m., Rybarczyk placed an order to *purchase* 75,000 shares (only 20,000 of which he successfully acquired); at 3:52 p.m., Rybarczyk successfully placed orders to purchase an additional 155,993 shares; and, at 3:58 p.m., Rybarczyk purchased 75,000 more shares. Thus, by 3:58 p.m., Rybarczyk held far more shares—425,000—than he held at 1:37 p.m.—250,000 shares—which is when he first began to Tweet. There had been no "dump."

That afternoon, Rybarczyk tweeted multiple times about GTT. At 4:06 p.m., Rybarczyk wrote: "$GTT Short Squeeze to $3" followed by a sale of 50,000 shares at a price of approximately $1.99/share. There were additional tweets at 4:08 p.m. and 4:09 p.m.: "$GTT won't end pretty on the short side. Book value $3.44" or "$GTT Insane weekly; One of the most beat up technology names out there. Just playing the bounce here." *Id*. ¶52. The Indictment

---

[15] For Rybarczyk's trading records concerning GTT, *see generally* DOJ-PROD-0000164428 at rows 857 to 4176.

labels these tweets as "false" but does not explain why, although it appears, once again, that they are purportedly "false" because Rybarczyk had sold 50,000 shares of GTT contemporaneously with the tweet without disclosing that sale, followed by an additional sale of 50,000 shares of GTT at 5:19 p.m. at an average price of $1.90. *Id.* Nonetheless, despite Rybarczyk's allegedly criminal tweeting, Rybarczyk ended the day with far more shares (325,000) than he held before he began tweeting (250,000). And, the next day (March 2), Rybarczyk continued to buy more shares of GTT, including a 50,000 share purchase at 10:33 a.m. at an average price of $2.09/share and a 50,000 share purchase at 10:47 a.m. at an average price of $2.15/share—far higher than he had sold his shares the day before. In fact, Rybarczyk purchased approximately 45,836 shares at 5:31 p.m. on March 2, at an average price of approximately $2.25-$2.30/share; he sold those shares the next morning at an average price of *just $2.05/share*, far lower than the price at which he had purchased the shares.[16]

In addition, although the Indictment characterizes GTT as a pump and dump, there are no allegations that any of the Defendants caused the price increase in GTT. This is not surprising given that many other Twitter commentators—well before March 1, 2021—had also commented on GTT having potential for significant upside.[17]

**3.**     **UPC – July 2021**

The Indictment alleges only that Rybarczyk purchased UPC stock on July 22, 2021 at an average price of $3.359/share, and then, on July 23, 2021 at approximately 7:19 a.m., falsely claimed in a Tweet: "$UPC no BS here. Full position intact, I don't dump. I think we get a halt

---

[16] It is unclear how Rybarczyk's "buy high" and "sell low" strategy could have been part of a scheme to defraud.

[17] *See, e.g.,* TWITTER, https://twitter.com/search?q=%24GTT%20until%3A2021-03-04%20since%3A2021-02-24&src=typed_query&f=live (last visited May 11, 2023).

up at open ….” Ind. ¶73. This was false, the Government alleges, because at 7:34 a.m.—15 minutes later—Rybarczyk sold approximately 50,000 shares of UPC, and by 9:39 a.m., Rybarczyk had sold all of his shares of UPC. *Id.* ¶79. Thus, the “falsity” is, again, Rybarczyk’s alleged failure to disclose his intent to soon sell.

But the Government’s “fraud” narrative makes little sense when seen in context. As gleaned from trading records provided in discovery,[18] Rybarczyk had been purchasing UPC up through the end of after-hours trading on July 22nd. At 4:52 p.m., Rybarczyk placed a buy order for 50,000 shares that executed at approximately $4.21/share. At approximately 8:00 p.m., just before after-hours markets closed, Rybarczyk purchased 25,000 additional shares, which was executed at a price close to *$5/share*. Put simply, the share price had exploded on July 22nd, and Rybarczyk had bought into that explosion. That is why Rybarczyk predicted, in his Tweet early the next morning, that UPC would get a “halt up” at the opening (Ind. ¶79), meaning that trading would be temporarily halted due to the rapid price increase.

Rybarczyk was not predicting a further price increase, he was predicting that trading would be temporarily halted, which could drive the price down. Rybarczyk appeared to be correct. At 7:34 a.m., just after his Tweet, Rybarczyk placed a 50,000 share sell order at $4.40/share, well *below* what the stock had closed at the night before. The stock then whipsawed and changed directions, and Rybarczyk took advantage of that shift, placing a 25,000 share sell order at 9:31 a.m. that executed at approximately $4.80/share. But then the price of UBC shifted downwards again—not due to Rybarczyk’s miniscule sell order—and so just a minute later Rybarczyk sold 25,000 shares at approximately $4.30/share. The price of UPC then kept falling

---

[18] For Rybarczyk’s trades concerning UPC, *see generally* DOJ-PROD-0000164428 at 36711 to 36808.

to approximately $4, which is why Rybarczyk continued to sell his shares that morning.
Rybarczyk did not sell into a "pump"; he sold in reaction to the ever changing and rapidly falling
stock price.

### 4.   ABVC: August 11, 2021

The Indictment alleges that on August 11, 2021, Rybarczyk "pumped and dumped" the
security ABVC. Ind. ¶¶82-91.

The day before, August 10th, Rybarczyk placed numerous buy orders for ABVC,
including a purchase of nearly 85,000 shares with a limit price of $3.95 at the close of the trading
day at approximately 7:58 p.m. The next morning, Rybarczyk placed another buy order for
20,000 shares at approximately 8:10 a.m. (at a price of approximately $3.90, and with a
maximum price of $4/share). By 8:11 a.m. on August 11, Rybarczyk had accumulated 303,289
shares of ABVC. *Id*. ¶83.

At 8:24 a.m., Rybarczyk tweeted two opinion statements: "$ABVC Soaked a ton between
yesterday and a few fills when I got up. High conviction play $6+ first target. Keep on your WL
for coming days," *Id*. ¶84, and, at 9:30 a.m., "$ABVC LONG $6++++". *Id*. At approximately
9:35 a.m., Rybarczyk began selling his shares of ABVC, although he interspersed his sales with
Tweets such as: "$ABVC Still goes $6+" and "$ABVC Not anywhere near done. Full position
intact. 90% of swings all explode" and "$ABVC Near entry now. Holding 300k full." *Id*. ¶¶85-
88. The price of ABVC continued to decline that morning, landing below $3.50 by
approximately noon.[19]

---

[19] For Rybarczyk's trades concerning ABVC, see generally DOJ-PROD-0000164428 rows
167464 to 170579.

18

By 12:25 p.m. that day, Rybarczyk had sold all 303,289 shares of ABVC, earning profits of $59,345. *Id.* ¶89. At 4:49 p.m. that day, Rybarczyk tweeted that he was a "[b]ag holder" (meaning that he had lost money) and that: "I hold my word and don't dump on anyone." *Id.* ¶90.

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss the Indictment

The Constitution of the United States provides that citizens shall not be "deprived of life, liberty, or property, without due process of law" and that a criminal defendant must "be informed of the nature and cause of the accusation" against him. *See* U.S. Const. amends. V, VI.  Rule 7 of the Federal Rules of Criminal Procedure, which codifies those rights enshrined in the Fifth and Sixth Amendments to the Constitution, requires that all criminal indictments include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  The statement of the essential facts and the citation of the statute are separate requirements. *See, e.g.*, *United States v. Delaughter*, No. 3:09-002GHD-SAA-2, 2009 WL 1424424, at *1 (N.D. Miss. May 18, 2009) (noting that Rule 7(c)(1) requires both a restatement of the essential facts "*and*" the citation of the statute) (emphasis added); *see also United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) (same).

The Fifth Circuit further explains these requirements:  an indictment must "(1) enumerate each *prima facie* element of the charged offense; (2) inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecutions."  *United States v. Guzman-Ocampo*, 236 F.3d 233, 236 (5th Cir. 2000) (*quoting United States v. Gaytan*, 74 F.3d 545, 551 (5th Cir. 1996)).  An indictment also must contain sufficient facts to ensure the prosecution is for the same charges presented to the grand jury. *United States v. Nides*, No. CIRM.A. 14-40, 2014 WL 2894281, at *1 (E.D. La. June 26, 2014) (*citing United States v. Kay*, 359 F.3d 738, 756 (5th Cir. 2004)).

19

When an indictment fails to satisfy the requirements of Rule 7, Rule 12 of the Federal Rules of Criminal Procedure empowers a defendant to move to dismiss the indictment due to a "defect" therein, including a "lack of specificity" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B). Upon a defendant's motion to dismiss, the Court must accept the factual allegations on their face, *see Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n.16 (1952) but is not bound to accept as true a legal conclusion couched as a factual allegation. *See Gonzalez,* 686 F.3d at 129 ("Stating that an act is in violation of' a cited statutory section 'adds no factual information as to the act itself.") (*quoting United States v. Camp,* 541 F.2d 737, 740 (8th Cir. 1976)). Because Rule 7 codifies constitutional safeguards, the "precise manner in which an indictment is drawn cannot be ignored." *Sanabria v. United States*, 437 U.S. 54, 65–66 (1978); *see also United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("[T]he indictment must be considered as it was actually drawn, not as it might have been drawn.") . At the pretrial stage, a court may not weigh the sufficiency of the *evidence* underlying an indictment, but may evaluate the sufficiency of the Government's *allegations,* "so that it may decide whether [the facts alleged] are sufficient in law to support a conviction." *Russell v. United States,* 369 U.S. 749, 768 (1962); *see also United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998) (court is required with a motion to dismiss to "take the allegations of the indictment as true and to determine whether an offense has been stated").

**B.     The Charged Counts: Sections 1348 and 1349**

Counts 2 through 20 of the Indictment charge the Defendants with securities fraud in violation of 18 U.S.C. § 1348(1) and (2), a statute for which there is no controlling case law or pattern jury instructions in this Circuit.

But generally, with respect to Section 1348(2), the Government must prove that Defendants executed (1) a scheme or artifice; (2) "to obtain, by means of false or fraudulent

20

pretenses, representations, or promises, any money or property;" while possessing (3) fraudulent intent. *United States v. Hatfield*, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010). Both Sections 1348(1) and 1348(2), which are patterned on the mail, wire and bank fraud statutes, necessarily encompass common-law materiality standards, *see, e.g., Neder v. United States*, 527 U.S. 1, 16 (1999), as discussed in more detail below. *See also United States v. Baker*, No. A-13-CR-346-SS, 2017 WL 4853811, at *3 (W.D. Tex. Oct. 26, 2017), *aff'd*, 912 F.3d 297 (5th Cir. 2019), *opinion amended and superseded on denial of reh'g*, 923 F.3d 390 (5th Cir. 2019), and *aff'd*, 923 F.3d 390 (5th Cir. 2019) (holding that to prove a violation of Section 1348, the Government must show, amongst other elements, "that the scheme to defraud employed false material representations").

And to establish a violation of Section 1348(1), which makes it a crime to knowingly engage in a scheme or artifice "to defraud any person in connection with … any security of an issuer," the Government must demonstrate (i) fraudulent intent, (ii) a scheme or artifice to defraud, and (iii) nexus with a security. *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017); *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012).[20] In the Fifth Circuit a "scheme or artifice to defraud" requires the Government to prove, like with Section 1348(2), that a defendant "made some kind of false or fraudulent material misrepresentation" or concealed a material fact. *See United States v. Scully*, 951 F.3d 656, 671 (5th Cir. 2020); *United States v. Harris,* 821 F.3d 589, 598 (5th Cir. 2016); *United States v. Radley*, 659 F. Supp. 2d 803, 820 (S.D. Tex. 2009) ("Activity is only fraudulent if defendants made a misrepresentation of material

---

[20] Both *Mahaffy* and *Coscia* rely on a single district court case—*United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009)—for evidentiary support concerning the elements of Section 1348.

21

fact"), *aff'd*, 632 F.3d 177, 185 (5th Cir. 2011) (wire fraud requires a material

misrepresentation). Thus, while *Mahaffy* suggests that "false representations or material

omissions are not required for conviction under § 1348(1)," under Fifth Circuit precedent, they

*are* required.[21]

Finally, Count One of the Indictment charges Rybarczyk and the other Defendants with

conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349. *See* Ind. ¶¶ 115-18. To

establish a violation of Section 1349, the Government must demonstrate (i) an agreement

between two or more persons to commit an unlawful act, (ii) the defendant knew the unlawful

purpose of the agreement (an intent to commit securities fraud), and (iii) a defendant joined in

the agreement willfully, with the intent to further unlawful purpose. *See United States v.*

*Simpson*, 741 F.3d 539, 547 (5th Cir. 2014).

### III.    MOTION TO DISMISS, AT LEAST IN PART, THE ALLEGATIONS IN THE INDICTMENT CONCERNING "SCALPING," BECAUSE RYBARCZYK HAD NO DUTY TO DISCLOSE HIS STOCK SALES.

The crux of the Government's case against Rybarczyk and his co-Defendants is not that

Rybarczyk and the others were lying about the companies being discussed on social media, but

rather that at or shortly after the time that they were tweeting positively about a particular stock,

they failed to disclose to their Twitter followers—people they had no connection to and who

were not paying them for financial advice—that they was selling their shares or had an intent to

---

[21] Section 1348(1), which prohibits a "scheme or artifice … to defraud … any person" is similar in form to the first sub-section of the federal bank fraud statute, which prohibits a "scheme or artifice … to defraud a financial institution." *See* 18 U.S.C § 1344(1). This Circuit has consistently interpreted the "scheme or artifice … to defraud" language in Section 1344(1) as requiring "fraudulent pretenses or representations." *See, e.g., United States v. Perez-Ceballos*, 907 F.3d 863, 868 (5th Cir. 2018); *United States v. Madaio*, 656 Fed. Appx. 685 (5th Cir. 2016) ("a conviction under Section 1344(1) requires the knowing execution of a "scheme to defraud," such as through "false or fraudulent pretenses or representations intended to deceive others."). There is no reason to deviate from this precedent with respect to Section 1348(1).

sell. By failing to make such disclosures, the Indictment alleges, Rybarczyk and his co-Defendants committed securities fraud. That is not the law.

      **A.**    **Rybarczyk had no "duty" to tell his Twitter followers when he will sell his shares or when he has an intent to sell.**

Of course, "[n]ondisclosure [of information] can constitute proof of a scheme to defraud only where the defendant is under a duty to disclose." *United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016); *United States v. Gaspard*, 744 F.2d 438, 440 (5th Cir. 1984); *see also Arruda v. Curves Int'l*, 861 Fed. Appx. 831, 834 (5th Cir. 2021) (A plaintiff may rely on nondisclosure as "proof of a scheme to defraud only where the defendant is under a duty to disclose"). And it is well-settled that ordinary investors and citizens, such as Rybarczyk, do not owe a duty to disclose their stock trades to others. *See Chiarella v. United States*, 445 U.S. 222, 233 (1980) (rejecting Government's argument that there existed a "general duty" owed by everyone to "all participants in market transactions."). For this reason, to the extent that the Indictment relies on the alleged non-disclosure of sales or intent to sell, as described in Exhibit A, those allegations and corresponding counts must be dismissed.

In determining whether a "duty" existed, the proper place to begin is the Supreme Court's decision in *S.E.C. v. Capital Gains Research Bureau, Inc.* 375 U.S. 180 (1963), which established modern "scalping" law, *i.e.*, non-disclosure of stock sales in the face of positive advice concerning those same tickers.[22] *Capital Gains* held that a registered investment advisor had a duty to disclose to his clients a "practice of purchasing shares of a security for his own

---

[22] Although the Indictment does not use the term "scalping" by name, the conduct alleged in the Indictment is generally referred to as scalping, as the SEC's parallel complaint in this case, filed at *SEC v. Constantin et al.*, 22-CV-04306 (S.D. Tex. Dec. 13, 2022) explains clearly in paragraph 17: "The Primary Defendants, aided and abetted by Knight, engaged in a pattern of conduct, sometimes referred to as 'scalping,' in which they recommended the purchase of a particular stock without disclosing their intent to sell that stock."

account shortly before recommending that security for long-term investment and then immediately selling the shares at a profit upon the rise in the market price following the recommendation." The investment advisor assumed a duty to his clients because of the relationship of "trust and confidence" that financial advisors have with clients. *Id.* at 190.  For this reason, the advisor's "scalping" was a fraud. Clients expect their advisors to offer disinterested advice; as a result, advisors must "fully and fairly" reveal their "personal interests" to their clients.

Cases following *Capital Gains* built on the Supreme Court's limiting principle that scalping occurs when a person purportedly offering legitimate and trusted investment advice fails to disclose *any* pecuniary motive in making stock recommendations. As examples, in *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979), a prominent newspaper columnist was found liable because, when writing about securities, failed to disclose that he had purchased stocks days before his column was to be published so that he could sell the stock on the "short-swing rise in price." The columnist's readers, relying on his expertise and credibility, believed he was a disinterested advisor when in fact he profited from his own recommendations.

The court in *S.E.C. v. Park*, 99 F. Supp. 2d 889 (N.D. Il. 2000) found that the defendant, who operated an Internet bulletin board, had a duty to disclose his personal interests in his investments. Because of the unique facts of that case (*e.g.* subscribers were charged a "not-insubstantial" fee for recommendations), *Park* developed a relationship of "trust and confidence" that created a duty. *Id.* at 899. Notably, the *Park* court adopted the *Zweig* definition of scalping, determining that Park "scalped stocks by praising certain stocks in his columns *without revealing that he had invested in the stock at a discount price* prior to publishing the article with the intention of selling the stock on the wave of the price increase resulting from his article." *Id.* at

24

899. Relying on that, the *Park* court noted that the alleged fraud in *Park* occurred because the defendant "did not disclose that *he already owned shares of [the stock]* or that he had placed a limit order to sell his shares one minute before issuing his recommendation to buy." *Id.* at 901.

Last, in *S.E.C. v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019), the defendant scalped because he secretly funded supposedly independent promoters that recommended that investors buy the stock Plandai, while failing to disclose that he (while organizing and funding the promotional campaign), "beneficially owned shares of Plandai, intended to sell shares, and was actively selling his Plandai holdings into the public market." *See Fiore*, Complaint, Dkt. No. 2 at 3, 18-CV-5474 (S.D.N.Y. June 18, 2018). It was this failure of the defendant to disclose his pecuniary interest in the stock that rendered Fiore's conduct to be "scalping."

In short, following *Chiarella*, there is no general duty of traders to disclose stock sales. Such a duty arises only in *limited* circumstances, 1) where a person is acting in some type of fiduciary or trusting capacity *or* 2) fails to disclose *any* beneficial ownership in the touted securities, thereby making it appear that he is offering independent finance advice that can be relied upon by reasonable investors.

Here, none of the circumstances of traditional "scalping" apply. The Indictment does not allege that Rybarczyk (or any of the other Defendants) was acting in any type of fiduciary or trusting capacity. Nor could it. None of the Defendants are financial advisors (or possess any real financial acumen); the Defendants did not charge for their "advice"; and, they did not get paid to promote or tout any stocks. Moreover, the platforms that the Defendants employed to disseminate information—Twitter and Discord—are free platforms open to everyone that are also known sources of misinformation. In addition, the Defendants did not even tweet under their

25

real names: Rybarczyk used the moniker "Ultra_Calls". Put simply, these were meme Twitter accounts that were decidedly, and indisputably, governed by *caveat emptor.*

Further weighing against a finding that the Indictment has successfully pled the fraud of scalping is the fact that, as the Indictment makes clear, far from concealing their beneficial ownership of the stocks they touted on social media, the Defendants (and Rybarczyk) told everyone that they had "added" or were "adding" the tickers they tweeted about. *See, e.g.*, Ind. ¶¶ 22, 26, 113. Any reasonable person viewing these Tweets and messages would have understood that the reason that these Defendants were promoting various tickers was not because they were disinterested financial advisors, but rather because they wanted to see their own stock portfolios increase in value. *Compare with* SEC Investor Alert of April 10, 2017 (warning investors to be wary of investment research websites that "*appear to be an unbiased source of information* or provide commentary on multiple stocks" but instead may be an "undisclo*sed paid stock promotion*.").[23]

In fact, every person who holds a stock long—as the Defendants admittedly did—would have but one goal, to have the stock increase in value so that they could sell it and take profits. Indeed, that is the *only* plausible reason for encouraging others to purchase stocks in which a person has a long position. Because of this, there cannot be a "duty to disclose" either an intent to sell or future stock sales because such future stock sales are *already implicit* in the disclosed stock ownership. *Cf. S.E.C. v. Blavin*, 557 F.Supp. 1304, 1312 (E.D. Mich. 1983) (citing *Zweig* and *Capital Gains* and holding that "Blavin's *failure to disclose his substantial ownership of*

---

[23] *See, e.g., Investor Alert: Beware of Stock Recommendations on Investment Research Websites,* INVESTOR.GOV (Apr. 10, 2017), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-4.

*stock in the companies he was touting, and* his intent to sell them soon after recommending that they be bought, was a material omission in violation" of Section 10(b)).

And if that were not clear enough from the tweets concerning the Defendants' own stock positions, certainly the Defendants' tweets posting their profits, the value of their trading accounts, and their luxurious homes and vehicles (Ind. ¶10), would have told every person who viewed their accounts that these Twitter influencers were not purporting to be disinterested financial advisors but were instead fueling their luxurious lifestyles by selling the very same shares they discussed on Twitter. For this reason too, the Defendants could not have been under a duty to disclose their trades to their Twitter followers.[24]

For all these reasons, the Indictment fails to allege that Rybarczyk had a duty to disclose his specific stock sales or intent to sell on Twitter or Discord.

### B.   SEC and statutory stock purchase and sale disclosure rules already in place further confirm that neither Rybarczyk nor any of the other Defendants had a duty to disclose stock sales or an intent to sell.

That Rybarczyk (and the other Defendants) was not required to disclose his stock sales or intent to sell is further reinforced by current Securities and Exchange Commission disclosure rules, which do not apply to people like him.

The securities laws mandate strict disclosure rules for company insiders, major investors in the stock, and paid stock promoters. For example, when an individual or group acquires more than 5% of a company's stock, a Schedule 13D must be filed within 10 days of crossing the 5% threshold. *See* Exchange Act Rule 13d-1(a), Likewise, when a 5% shareholder acquires or sells a

---

[24] The Indictment also does not contain any allegations that Rybarczyk's tweets or Discord messages (or anyone else's for that matter) drove a material increase in the stock price or sales volume. It makes no sense for a person whose tweets are not moving the stock price higher to have an affirmative "duty to disclose" his sales, as such a requirement would serve no practical purpose because the tweets would not be impacting purchasing decisions.

27

material amount of stock, she must then file an amended Schedule 13D "promptly," which courts have generally held to be within "ten calendar days from the date of the transaction."[25]

Company insiders, officers and directors must also report their purchases or sales of a company stock. But Form 4—the form on which such disclosures *to the SEC* are made—must only be filed within two business days *after* the transaction date.[26] *See* https://www.sec.gov/files/forms-3-4-5.pdf. No one is required to Tweet out their sales. And last, the SEC has promulgated specific rules for stock promoters, and these rules do not apply to people such as Rybarczyk. Rather, Rule 17b of the Securities Act of 1933 requires anyone who is *compensated* for promoting a stock to disclose the details of the compensation to potential investors.[27] No such compensation was paid here.

To summarize, large shareholders have 10 days to disclose stock sales or purchases. Company insiders, officers and directors have two days subsequent to a transaction to disclose their purchases or sales *to the SEC*, which then puts the forms online. In fact, the only individuals required to publicly disclose any efforts to promote a stock are those who receive compensation for doing so. Given this well-established framework, why would a company outsider holding shares purchased in arms-length transactions on the open market have a duty to disclose his sales—a higher duty than that imposed by the SEC for insiders, executives, major shareholders, and paid promoters—just because he tweets?

---

[25] *See* 17 C.F.R. § 240.13d-2; *see also* Samir Doshi, *The Timing of Schedule 13D,* HARV. LAW SCHOOL FORUM ON CORP. GOV. (June 23, 2019), https://corpgov.law.harvard.edu/2019/06/23/the-timing-of-schedule-13d/#:~:text=In%20keeping%20with%20congressional%20intent,less%20than%20ten%20calendar%20days.

[26] *See Insider Transactions and Forms 3, 4, and 5,* INVESTOR.GOV, https://www.sec.gov/files/forms-3-4-5.pdf (last visited May 11, 2023).

[27] 15 U.S.C. § 77q.

For these reasons too, Rybarczyk had no duty to disclose his stock sales to his Twitter followers.

**C.     Recent events make clear that the federal securities laws do not mandate disclosure of stock sales by non-insider individuals who promote securities without compensation.**

Recent events have made it clear that federal securities laws do not mandate disclosure requirements of stock sales or an intent to sell by individuals who promote securities without compensation. As examples:

**Luna Coin:** Billionaire investor Michael Novogratz repeatedly touted and promoted the crypto-asset Luna—which both he and his investment firm, Galaxy Digital, owned—on Twitter through the fall and winter of 2021-22.[28] Novogratz even promoted the crypto-asset by posting pictures online of a Luna tattoo that he permanently etched into his arm.[29]

> **Commented [A1]:** Link to tweet doesnt work and I can't find the tweet searching, we need to confirm it still exist.

---

[28] Elliott Laybourne, *LUNA Price Explodes 80% After Novogratz Pumps Terra Coin on Twitter*, INVESTINGCUBE (Aug. 19, 2021), https://tinyurl.com/3varh3v4.

[29] Gregory Zuckerman and Justin Baer, *Mike Novogratz's Crypto Comeback Faces a Trial By Fire*, WALL ST. J. (June 4, 2022, 12:00 AM), https://tinyurl.com/7raszcc7 (Galaxy reported on May 9 that it sold at least part of its Luna stake during the first quarter of 2022. Realized gains on sales of Luna and other assets totaled $355 million in the period ending in March, the firm said. Galaxy hasn't said if it was still holding any of the currency when it lost nearly all its value in May); *see also* https://tinyurl.com/4cdtka8p (Twitter account of Novogratz, Jan. 4, 2021, posting photo of tattoo – the Tweet received more than a 1,312 retweets).

29



Novogratz's firm, undisclosed, dumped Luna in Q1 2022, realizing $355 million in profits,[30] just before Luna spectacularly collapsed in early May 2022. But Novogratz, who had been selling all along, credited the fact that he was taking "profits" during Luna's rise, a "core tenant[] of investing," as the reason why his firm did not suffer from its fall.[31] As of May 12, 2023, Novogratz has not been charged with securities fraud.

**<u>Bed Bath and Beyond</u>:** In the spring of 2022, investor Ryan Cohen purchased a large stake in Bed Bath and Beyond (BBB).[32] Cohen advertised this as a long-term position that he would hold in order to turn around the struggling retailer.[33] Cohen also purchased far out-of-the-money stock options with an expiry date in January 2023 (again indicating that he bought to hold). On August 16, 2022, Cohen filed a Schedule 13D with the SEC touting that he had

---

[30] Rodney Holmes, *Galaxy Digital Lost $544 Million After Fall of Terra (LUNA), Bitcoin and Other Cryptocurrencies*, CRYTOSAURUS (Aug. 8, 2022), https://cryptosaurus.tech/galaxy-digital-lost-544-million-after-fall-of-terra-luna-bitcoin-and-other-cryptocurrencies/.

[31] Galaxy (@galaxyhq), TWITTER (May 18, 2022 2:00 PM), https://tinyurl.com/v8uzw7zu.

[32] *See Si v. Bed Bath and Beyond Corp. et al.*, 1:22-cv-02541-TNM, Class Action Complaint, filed on Aug. 24, 2022 (D.C.), available at: https://tinyurl.com/2vrjypby.

[33] *See* Letter from R. Cohen, Mar. 6, 2022, available at https://s.wsj.net/public/resources/documents/bbbletter030622.pdf (touting that Cohen was "maniacally focused on the long-term").

*increased* his ownership of BBB shares to 11.8% of all outstanding shares.[34] BBB stock price

then skyrocketed, and Cohen, with the assistance of JP Morgan Chase, secretly dumped all his

shares into the market. Two days later, Cohen filed a Form 4 with the SEC, confirming that he

had sold all of his BBB shares, and as a result, BBB's stock price fell 45%.[35] As of May 12,

2023, Cohen has not been charged with securities fraud.

     **Coinbase Direct Listing:** Coinbase went public pursuant to a direct listing on April 14,

2021. The S-1 registration statement, filed just days before the direct listing was rife with rosy,

optimistic statements about Coinbase's business, describing Coinbase as "power[ing] the

cryptoeconomy" and being a "leading provider of end-to-end financial infrastructure and

technology for the cryptoeconomy."[36] *See also* S-1 page 90 ("Our unique approach draws retail

users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail

users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth

of crypto assets that we offer, and launch new, innovative products and services that attract new

customers."). Brian Armstrong, the CEO, drafted a "letter"— included in the S-1—describing

how Coinbase has "always taken a long-term view," and how Coinbase is "investing in growth

because we believe that scale is critical to achieving the potential of [Coinbase] business model."

*Id*. pages vii-vii.

---

[34] *See* Bed Bath & Beyond Inc. Schedule 13D (Amendment No. 2), *EDGAR*, Securities and Exchange Commission, 2022, https://tinyurl.com/pmv67fww.

[35] *See* Bed Bath & Beyond Inc. Schedule 13D (Amendment No. 3), *EDGAR*, Securities and Exchange Commission, 2022, https://tinyurl.com/4jxn78sh.

[36] SEC, Amendment No. 2 to Form S-1 (Mar. 23, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162828021005373/coinbaseglobalincs-1a2.htm; *see also* SEC, Coinbase Prospectus (Apr. 1, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162828021006850/coinbaseglobalinc424b.htm.

To be certain, the S-1 *did* state that "[r]egistered stockholders *may* elect to sell shares of" Coinbase Class A common stock covered by this prospectus." *Id.* at 78. The prospectus *did* list out that Coinbase executives, including Armstrong, owned large quantities of common stock eligible to be sold. *Id.* at 186-87. However, the registration statement *did not* say that officers and directors—all with access to material non-public information about the company—planned to dump nearly $3 billion worth of Coinbase stock on the day of the direct-listing (April 14, 2021) and in the first few days following the listing. As described in a complaint against Coinbase management filed recently in Delaware Chancery Court, Armstrong himself sold nearly $300 million worth of stock on the day of the direct listing. *See Adam Grabski v. Marc Andreesen, Brian Armstrong, et al.*, C.A. No. 2023-0464-KSJM (Del. Ch. Ct. May 1, 2023). And, the CEO did not disclose these sales until two days *after* he sold.[37] The Chief Product Officer, Surojit Chatterjee, sold $62 million in stock; Emilie Choi, the Chief Operating Officer, sold more than $220 million in stock (24% of her total holdings); Alesia Haas, the Chief Financial Officer, sold nearly $100 million in stock. *See Grabski* complaint at page 48. After news of these sales was made public—approximately two days after the sales occurred—Coinbase stock declined by approximately 10% in the ensuing days. Coinbase's stock, which traded at over $400 at the time of the direct listing, now trades for less than $60. As of May 12, 2023, no Coinbase executives have been charged with failing to disclose their intent to sell in light of the S-1's glowing review of Coinbase's business.

---

[37] SEC, Coinbase Global Statement of Changes in Beneficial Ownership (Apr. 16, 2021), https://www.sec.gov/Archives/edgar/data/1851492/000120919121027138/xslF345X03/doc4.xml .



The Luna and BBB collapses caused hundreds of millions, if not billions, in losses to investors. The Coinbase direct listing allowed senior executives to sell nearly three billion dollars of stock to investors without disclosing their sales in advance, and the stock price predictably declined as a result. But the dumpers all profited. If Novogratz, Galaxy Digital, Ryan Cohen, JP Morgan, Coinbase, and *all their highly paid and well-trained legal advisors*, all believe that the securities laws do not mandate sales disclosure in such circumstances, how would retail investors with no financial background or experience know that they have a duty to disclose their sales to their Twitter followers?

Last, the SEC itself has rejected efforts by certain academics to expand the narrowly tailored traditional definition of "scalping" to encompass those engaged in short-selling who fail to tell the public when they have covered or intend to cover their short sales. In that regard, Joshua Mitts, a law professor at Columbia University well-known for railing against activist short sellers, drafted a petition to the SEC (signed by multiple other prominent academics)

33

demanding that when activist investors publicly take a short position in a company—a move that can frequently result in a decrease in the stock's price—the activist investors must also tell the public when the short position has been closed.[38] Put bluntly, Mitts wanted the SEC to make clear that "voluntarily making a statement like 'we are short [company name]' imposes a duty to announce when the activist no longer stands to profit from a decline in the share price …". Mitts further asked the Commission to clarify "that rapidly closing a short position after publishing (or commissioning) a report, without specifically disclosing an intent to do so, can constitute fraudulent scalping in violation of Rule 10b-5." In arguing for this position, Mitts wrote that "when a short seller states that a company is worth a given valuation but purchases the stock at a price higher than the indicated valuation, the short seller … is buying at the same time that he or she is encouraging other investors to sell."

The SEC, however, declined to adopt the proposed rule, and instead adopted Rule 13f-2, which mandated only that broker-dealers maintain some additional data concerning the coverage of short positions.[39] Thus, when given the opportunity to expand "scalping" beyond that of the traditional scalping, the SEC has declined to do so.

In sum, both Section 1348(1) and (2) require the Government to prove either a material misrepresentation or a material omission, which requires a duty to disclose. Because the Indictment fails to plead that Rybarczyk had such a duty to disclose his stock sales to his Twitter followers, the fraudulent "omission" claims (namely scalping) in the Indictment, as described in Exhibit A, must be dismissed.

---

[38] Letter Petition for Rulemaking on Short and Distort (Feb. 12, 2020), https://www.sec.gov/rules/petitions/2020/petn4-758.pdf.

[39] 17 CFR Part 240, 242, and 249, SEC.GOV (Feb. 25, 2022), https://www.sec.gov/rules/proposed/2022/34-94313.pdf.

34

**IV.    MOTION TO DISMISS FOR FAILURE TO ALLEGE THE MATERIALITY OF THE ALLEGED MISSTATEMENTS AND OMISSIONS IN THE INDICTMENT.**

For securities fraud charged under Sections 1348 or 1349, a statement or omission can only be material if it has a "natural tendency to influence, or [be] capable of influencing, the decision of the decision making body to which it is addressed." *See Neder*, 527 U.S. at 16; *United States v. Evans*, 892 F.3d 692, 712 (5th Cir. 2018). Whether or not a statement is so capable is evaluated objectively. *Evans*, 892 F.3d at 712; *see also Neder*, 527 U.S. at 16.

The pattern jury instructions for the Fifth Circuit state that materiality can be proven in either of two ways: "First, a representation [statement] [pretense] [promise] is "material" if a reasonable person would attach importance to its existence or nonexistence in determining his [her] choice of action in the transaction in question. Second, a statement could be material, even though only an unreasonable person would rely on it, if the person who made the statement knew or had reason to know his [her] victim was likely to rely on it." An assessment of materiality requires viewing the facts in the context of "all the circumstances," including the "total mix" of information. *See United States v. Causey*, No. CRIM. H-04-025-SS, 2005 WL 2647976, *24 (S.D. Texas 2005) (*citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "[A]n allegation of fraud in an indictment will be sufficient so long as 'the facts alleged in the indictment warrant an inference that the false statement is material.'" *United States v. Bieganowski*, 313 F.3d 264, 285 (5th Cir. 2002) (citation omitted).

Here, although the Indictment uses the word "material" approximately 20 times, and attempts to generically explain how the Defendants' statements and omissions were "material" (*see, e.g.*, Ind. ¶ 134), the Indictment fails to sufficiently allege—when viewed in the proper context—how a Twitter user's failure to disclose his own stock sales or alleged misstatements concerning his own holdings could ever be material as a matter of law.

35

**A.** **Using ABVC as an example, the Indictment fails to allege that anyone actually relied on Rybarczyk's tweets to make trading decisions.**

With the ticker ABVC, the Indictment sets forth a number of Tweets that are allegedly

materially false and misleading or contain material omissions. These are set forth below:

| | |
|---|---|
| **Paragraph 84** | "$ABVC Soaked a ton between yesterday and a few fills when I got up. High conviction play $6+ first target. Keep on your WL for coming days." And "$ABVC LONG $6+++." |
| **Paragraph 85** | At 9:35 a.m., Rybarczyk started selling his shares of ABVC. |
| **Paragraph 86** | "$ABVC Still goes $6+." |
| **Paragraph 87** | "$ABVC Not anywhere near done. Full position intact. 90% of swings all explode." |
| **Paragraph 88** | "$ABVC Near entry now. Holding 300k full." |
| **Paragraph 90** | "[b]ag holder"—at or about the time that the price of ABVC had declined—and falsely maintained that "I hold my word and don't dump on anyone." |
| **Paragraph 91** | "sorry all about $ABVC[.] Taking time to make sure next is a big winner. I'll make sure it's available to discord and Twitter same time too …" |

Although the Indictment alleges that Rybarczyk "pumped and dumped" ABVC through

"false representations, pretenses and material omissions," there are no allegations—at all—in the

Indictment that any person based their trading decision on the fact that Rybarczyk 1) failed to tell

his Twitter followers of his specific stock sale, or 2) tweeted out various highly opinionated and

generic Tweets such as "ABVC LONG" or "ABVC Not anywhere near done." In fact, there are

no allegations that Rybarczyk's tweets caused any increase in either the volume or the price of

ABVC at all, which is, of course, the *sine qua non* of a pump and dump. Because of this, any

failure to reveal stock sales, accurately describe one's holdings, or mistakenly predict the

perceived direction of a stock, could *not* have been material because the Indictment does not

allege that anyone made trading decisions based on what Rybarczyk tweeted.

36

This conclusion is only reinforced by the allegations in the Indictment, which describe how by the morning of August 11, 2021, Rybarczyk had accumulated 303,289 shares of ABVC at "an approximate price of $3.489 per share." Ind. ¶83. And then, Rybarczyk tweeted a few times and began to sell at an approximate price of $3.685/share, earning a profit of $59,345. *Id*. ¶89. The Indictment purports to establish materiality by describing how the average sale price was higher than the average purchase price. What the Indictment does not say, however, is that ABVC opened for trading on the morning of August 11, 2021 at $3.92/share, meaning that the price had actually *declined* from the time of Rybarczyk's first tweet concerning ABVC as mentioned in the Indictment. Far from alleging "materiality," the allegations make clear that Rybarczyk's ABVC tweet had little to no impact.

**B.** **The Indictment fails to allege how the context in which the statements were made—on Twitter and Discord by non-insiders with no connection to the companies—rendered the statements (or omissions) material.**

With respect to the social media tweets and messages themselves, when properly viewed in the context of how they were made, it is clear that they could not have been material.

Twitter is an inherently unreliable forum, and Rybarczyk tweeted under an alias— Ultra_Calls—which further demonstrates that no reasonable or even unreasonable person had any right to rely on his Tweets. *Cf. Ganske v. Mensch*, 480 F. Supp. 3d 542, 552 (S.D.N.Y. 2020) (in dismissing defamation case against an individual based on Twitter comments, the court collected cases and ruled that "[l]ike the other internet for a discussed in the above-cited cases, Twitter's forum is equally – if not more – informal and "freewheeling.").

In addition, continuing with the ABVC example, none of the Tweets were purported to be fact-checked, and Rybarczyk did not provide any back-up source material or financial analysis to support his generic missives about how the stock price could perform in the future. Far from providing any reliable indicia that could cause anyone to purchase stocks based on the Tweets, it

37

is well-apparent that any Twitter follower would not purchase stock because of just how vague, meaningless, and unreliable the tweet content actually was. For this reason too, Rybarczyk's tweets and omissions could not have been material.

      **C.**    **Rybarczyk's statements and omissions as alleged in the Indictment were not material as a matter of law to the underlying stock trades entered into by the "victims."**

Even fully crediting for the purposes of this motion the Government's interpretation of the tweets at issue, it is apparent that they are immaterial as a matter of law because, at most, they constitute "a party's opinions, preferences, priorities" on topics such as "judgment as to quality [or] value" and not "statements of fact material to the transaction." *United States v. Weimert*, 819 F.3d 351, 358 (7th Cir. 2016) (quoting Restatement (Second) of Torts § 538A cmts. b, g) (overturning wire fraud conviction of bank executive because he lied about his "negotiating position" and not about "any material facts or about promises of future actions").

Commented [A2]: This is obviously our weakness but I think we need to include this or lose credibility. I think we take the position that *omissions of intent* is different from a concrete deception of future action. So for example a tweet about ""New swing $TRCH[.]" doesn't contain a concrete promise to do anything.

According to the Indictment, the alleged "victims" in the case – retail traders – followed Rybarczyk and the other Defendants on social media in order to glean stock tips and gain insights into how to trade. When Rybarczyk and other Defendants tweeted, the "victims" then purchased, on the open market, the stocks that the Defendants posted about on social media. To be certain, and solely for the purposes of this motion to dismiss, the Court must assume that had the victims known that the Defendants were selling shares at the time of their tweets, they would not have purchased the stock. But this is not securities fraud. The "victims" received exactly the "benefit of the[ir] bargain" here—a certain number of shares for a given price, all obtained on the open market. *See United States v. Davis*, No. 13-CR-923 (LAP), 2017 WL 3328240, at *9 (S.D.N.Y. Aug. 3, 2017) ("Our cases have drawn a fine line between schemes that *do no more than cause their victims to enter into transactions they would otherwise avoid*—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a

38

misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.") (internal quotation marks omitted).

The distinctions set out in these cases between material representations going to the heart of the transaction and those misrepresentations concerning collateral issues are critical because, as courts routinely recognize, fraud statutes such as Section 1348 were not meant to capture the kind of self-interested posturing that routinely occurs in transactions involving the financial markets. *See, e.g., United States v. Coffman*, 94 F.3d 330, 334 (7th Cir.1996) (noting in wire fraud case that nearly "all sellers engage in a certain amount of puffing; all buyers ... know this; it would not do to criminalize business conduct that is customary rather than exceptional"); *see also United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) ("Not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'"); *Weimert*, 819 F.3d at 357 ("Congress could not have meant to criminalize deceptive misstatements or omissions about a buyer's or seller's negotiating positions."). To be sure, the statutes could technically be read to apply to cover nearly any misstatement, "at least if a negotiator's present state of mind is treated as a fact," *Weimert*, 819 F.3d at 357 (running through the elements of wire fraud and showing that "[f]rom strands of case law, it is true, one can piece together a mail or wire fraud case based on" such limited deceptions), but context, once again, is key.

The recent case of *United States v. Robert Bogucki*, 18-CR-0021 (N.D. Ca.) illustrates how lies and misstatements in the context of traders negotiating an arms-length securities transactions are not "material" to a counterparties' decision-making process. In *Bogucki*, the defendant, an FX trader, was charged with multiple counts of wire fraud based on false statements and omissions made to or withheld from a counter-party in an options transaction where the counter-party had informed *Bogucki*, a Barclays bank employee, of its future intent to

39

an unwind a large options transaction. After trial, the Court granted Bogucki's Rule 29 motion to dismiss the fraud charges on the grounds of materiality, even refusing to let the case go to the jury. *See USA v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959, at *5 (N.D. Cal. Mar. 4, 2019).

*First*, the judge rejected the notion that Bogucki owed any duty of trust and confidence to a counter-party engaging in an arms-length transaction. *Then*, the judge went through the specific lies and omissions that Bogucki was alleged to have made to the counter-party. Like here, the Government argued that Bogucki had lied about his trading position, telling the counterparty that he was "long" in a trade when in fact, he was "short." The Court rejected the argument that the counter-party had any reason to believe that Bogucki was "being truthful" about his trading position "in the context of their arms-length negotiations"— traders are known to posture about their positions—therefore, there was "no evidence to support the Government's theory that this statement was capable of influencing" the trading counterparty. The Court also rejected the Government's other materiality arguments, holding that they were either opinions (which would not influence a trader) or accompanied by exculpatory warnings that cabined *Bogucki's* representations to the counter-party about his intent in executing the options transaction.

Here too, even crediting the allegations in the Indictment, the statements and misrepresentations could not have been material because: 1) the Tweets do not go to the nature of the bargain here—the "victims" got exactly what they wanted, a certain number of shares for a certain price in an open-market transaction in which they could see for themselves any sudden prior price moves, and 2) when viewed in the context of arms-length transactions with trading counter-parties, no one would have expected a social media-based trader to be completely open and honest in his or her trading positions.

40

**D.** **The Tweets are not Material Because They Constitute Opinion Statements and Lawful Puffery.**

Many of the Tweets alleged in the Indictment cannot form the basis for a securities fraud prosecution because they are obviously opinions or constitute lawful "puffery." *See United States v. Radley*, 659 F. Supp. 2d 803, 820 (S.D. Texas 2009) (to prove a scheme to defraud, the government must show "fraudulent activity," and activity can only be "fraudulent if Defendants made a misrepresentation of material fact." ); *see United States v. Correia*, 55 F.4th 12, 27 (1st Cir. 2022) (mere opinion is not wire fraud); *United States v. Rodriguez*, 732 F.3d 1299 (11th Cir. 2013) (Puffing or sellers talk is not a crime under federal fraud statutes); *United States v. Martinelli*, 454 F.3d 1300, 1317 (11th Cir. 2006) (statements of mere opinions are not fraud); *United States v. Shelton,* 669 F.2d 446, 465 (7th Cir. 1982) (under the mail and wire fraud statutes," there is a difference between 'puffing' and representations that are sufficient to support a scheme to defraud"; "knowingly false statements of fact," as opposed to expressions of opinion, can support the existence of a scheme to defraud.).

As set forth above, it is the Government's contention that Rybarczyk's tweets concerning a future price target were fraudulent. *See, e.g.,* Ind. ¶¶84 ("High conviction play $6+ first target."); 86 ("$ABVC Still goes $6"); 87 ("90% of swings all explode"). Likewise, it is the Government's claim that generic commentary on the value of a stock is also fraudulent. *See, e.g.*, ¶¶94(a) ("CEI … that's cheap AF"); 94(d)("Don't panic on $CEI and tag me every 20 minutes. It's a swing … I think we get a close over .50 by end of day and start the climb higher."). But of course, such "vague and optimistic type [of statements] … cannot support a securities fraud action … [as they] contain no concrete factual or material misrepresentation." *See United States v. Sneed*, No. 3:19-CR-0580-B, 2022 WL 35801, *8 (N.D. Tex. Jan. 4, 2022) (*citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 174, 184 (2015)).

41

Moreover, that a person sold shares shortly after an optimistic tweet as to a certain stock price target does not change the tweet from an opinion into a false statement of fact unless there is a "gross disparity between prediction and fact," which the Indictment does not allege. *See Lormand v. US Unwired, Inc*. 565 F.3d 228 fn. 13 (5th Cir. 2009) (opinions can only be actionable if there is a "gross disparity between prediction and fact.").

For this reason too—many of the statements are non-actionable puffery and opinions—the Indictment fails to allege materiality.

**E.      Many of the tweets and statements alleged in the Indictment could not have influenced anyone's decision to trade.**

There are numerous Tweets alleged in the Indictment that could not have been material to a person's belief as to when to purchase stock simply due to various factors discussed herein.

As examples, Rybarczyk tweeted, *after* he sold all his shares in ABVC that he was a "bag holder," meaning that he lost money. Ind. ¶90. Given this negative comment, no one would have purchased stock because of it, and Rybarczyk, having sold his shares, would have gained nothing. This tweet cannot form a basis for fraud. Rybarczyk's tweet on August 12, 2021 apologizing to his Twitter followers for the performance of ABVC after he sold his shares could not have been material for the same reasons. Ind. ¶91. And while the Government claims that Rybarczyk lied about his trading position by falsely stating "Full position intact" and "Holding 300k full," Ind. ¶¶87-88, there are no accompanying facts or trading analyses confirming that anyone—at all—either relied on these innocuous and unverified Tweets, or that the price of ABVC increased after these Tweets. This is hardly surprising as ABVC's price declined from about $3.92 at 10:10 a.m. to $3.45 by 12:25 p.m., less than two hours later. Thus, materiality is not alleged for these statements either.

The other stocks alleged in the Indictment with respect to Rybarczyk do not fare any better in alleging materiality. Counts 16 and 17 contain no details or facts as to why those tickers involved securities fraud. In fact, those counts fail to allege *any* statement or omission made by Rybarczyk. And as another example, with respect to the stock UPC (Count 13), Rybarczyk is alleged to have posted a single Tweet that stated: "$UPC no BS here. Full position intact, I don't dump. I think we get a halt up at open …". This Tweet was on July 23, 2021 at 7:19 a.m. Once again, there are no allegations in the Indictment that anyone purchased or sold stock based on that Tweet or that the stock price increased based on that Tweet.

For all these reasons, the Indictment fails to allege materiality and should be dismissed for this reason too.

**V.   MOTION TO DISMISS THE INDICTMENT ON THE GROUNDS THAT RYBARCZYK HAD NO NOTICE THAT SECTION 1348 AFFIRMATIVELY REQUIRED HIM TO DISCLOSE HIS STOCK SALES ON TWITTER.**

**A.   Legal Standards of "Fair Notice" Doctrine.**

The Fifth Amendment to the Constitution prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. V. To satisfy constitutional due process requirements, a statute must provide fair notice of the conduct that it prohibits. *Dunn v. United States*, 442 U.S. 100, 112 (1979) ("[F]undamental principles of due process . . . mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."); *see also United States v. Lanier*, 520 U.S. 259, 265 (1997) ("no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed"). These precepts are captured in three related doctrines: void-for-vagueness, rule of lenity, and the bar on novel constructions of criminal statutes.

***First*,** the void-for-vagueness doctrine "requires that a statute define a criminal or quasi-criminal offense 'with sufficient definiteness that ordinary people can understand what conduct

43

is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *see also Lanier*, 520 U.S. at 266 (doctrine "bars enforcement" when "men of common intelligence must necessarily guess at its meaning") (internal quotation marks omitted). "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

*Second*, "a sort of junior version of the vagueness doctrine the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Lanier*, 520 U.S. at 266 (cleaned up); *see also Liparota v. United States*, 471 U.S. 419, 427 (1985) (strict construction of criminal statutes, the rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statue as to apply it only to conduct clearly covered).

*Third*, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (cleaned up).

For each of these doctrines, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*. Here, it was *not* "reasonably clear at the relevant time" that Rybarczyk—a day trader operating a meme Twitter account—would be subject to criminal sanctions for failing to disclose his own stock trades and positions on Twitter to others.

44

**B.      Section 1348 is so vague and overbroad "that men of common intelligence must necessarily guess at it's meaning and differ to its application."**

Section 1348—a statute barely 20 years old—is so broad as to be almost indecipherable as to what conduct it prohibits and what disclosures are required. *Winters v. New York*, 333 U.S. 507, 515 (1948) (statute lacking "ascertainable standards of guilt" is constitutionally defective and void for vagueness.); *see also City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) ("The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'") (*quoting United States v. Reese*, 92 U.S. 214, 221 (1876)).

Certainly, the statute says nothing about whether social media afficionados—or anyone else for that matter—are required to disclose their own personal stock transactions to the public. And it is because of this well apparent overbreadth that the statute is seldom used by federal prosecutors. In fact, there is virtually no case law in the Fifth Circuit interpreting Section 1348.

It is nearly impossible to tell what exact conduct is proscribed by Section 1348. For instance, Section 1348(1) prohibits schemes to "defraud *any* person … in connection with … *any* security." It is unclear what that covers. Does that apply to someone who is engaged in a scheme to boost the price of a certain product when the corresponding increased sales revenue would then raise the price of the underlying stock? Would affirmatively lying about the quality of a product on Twitter meet the statutory definition if the company that makes the product is publicly traded? Does the statute, which uses the term "any person," protect people who do not even own the security?

Section 1348(1), by its own terms, does not even require that the scheme require as its goal the obtainment of "money or property." Under what circumstances can someone defraud a person "in connection with … any security" where the object of the scheme is *not* to obtain

45

money or property? Based on the alleged misrepresentations and omissions in the Indictment here—which includes allegations that the Defendants generically touted stocks while allegedly withholding their subjective beliefs about the stock—the Government certainly seems to believe that this statute proscribes *any* lies regarding a security, with no limiting principle. But that cannot be what Congress could have intended. *See, e.g., United States v. Dauray*, 215 F.3d 257, 264–65 (2d Cir. 2000) ("While it is true that our role as a court is to apply the provision as written, not as we would write it, the statute's ambiguity makes it impossible for us to apply the provision in this case without simply guessing about congressional intent.").

Put simply, there are no definable limits to Section 1348, and the statute provides no guidance to a reasonable person as to what conduct it actually prohibits. Instead, the broad language of Section 1348—particularly subsection (1)—effectively encourages and sanctions arbitrary and discriminatory enforcement, which is exactly what occurred here. No reasonable person would have understood that a brand new and untested securities fraud statute would purport to mandate that Twitter users disclose their stock sales to their followers.

Because the statute is vague, the charges against Rybarczyk should be dismissed for this reason too.

### C. No prior judicial decisions or securities disclosure rules informed Rybarczyk that his charged conduct—an alleged failure to disclose his stock sales and intent to sell on Twitter—would be within the scope of Section 1348.

Because there is little caselaw interpreting Section 1348, and on its face, as noted, Section 1348 proscribes little specific conduct, the only rationale way for an individual to know what conduct is truly encompassed by the statute is to look to the corollary securities fraud statues in Title 15— Title 15, United States Code, Section 78j and 17 C.F.R. Section 240.10b-5 (Section 10b5)—which have been in place for nearly 90 years and for which there is a large body of case law interpreting the contours of those statutes. And it is because of those statutes, which

46

make clear that the Government is overreaching here with a "novel construction" of Section 1348 and its requirements, that dismissal is mandated. *See Lanier*, 520 U.S. at 266 (A defendant cannot be punished under a "novel construction" of a statute if "neither the statute nor any prior judicial decision has fairly disclosed [the defendant's conduct] to be within its scope.")

**First**, traditional securities laws have never mandated the public disclosure of stock sales or an intent to sell simply because someone chose to engage with the public on Twitter. Rather, as described above, traditional "scalping"—*i.e.* a failure to disclose stock sales while touting stock—has largely been confined to those with a duty to disclose, *i.e.*, fiduciaries and those who have positions of trust with a victim. *Chiarella*, 445 U.S. at 228 ("one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.").

Because of this limitation, it would make little sense for Rybarczyk, an operator of a meme Twitter account who has disclosed his purchases of a stock—thereby telling his followers that he wants to make money from ownership of that stock—to come to the conclusion that he had a duty to disclose his stock sales when securities laws that have been in place for nearly 90 years tell him that he does not have to so disclose. This conclusion is only buttressed by the fact that the SEC and DOJ have repeatedly failed to prosecute others who engaged in strikingly similar conduct.

**Second**, it has been recognized for more than 40 years that traditional Title 15 securities laws have a higher materiality standard—focusing on whether a "reasonable investor" would be defrauded by an omission—than Section 1348. *Compare Basic v. Levinson*, 485 U.S. 224, 231

47

(1988) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") *with Neder*, 527 U.S. at 16 (statement is material if it has a "natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it is addressed).  The *Levinson* court was rightly concerned that in the context of securities it should not "set too low a standard of materiality … [as] a minimal standard might bring an overabundance of information within its reach …." 485 U.S. at 231. This difference in the materiality standards between the two statutes is critically important here.

"Reasonable investors" are those who glean investment advice from company financials, statements put out by executives, and market earnings reports. Twitter users who take advice from accounts such as "Ultra_Calls"—an influencer whose stock picks were interspersed with tweets about luxury sports cars—could not, *as a matter of law*, be reasonable investors under the *Basic v. Levison* standard. Because of this, any person discussing stocks on Twitter or Discord would not believe that he had any duty to disclose his personal trades because the "advice" that he was providing could not have been viewed as material. For this reason too, Rybarczyk was not on notice that his conduct was prohibited by law.

**Third,** as described above, the SEC has prescribed specific stock sale and promotional disclosure rules, and these rules do *not* apply to people like Rybarczyk. To the contrary the SEC's own websites—citing the Constitution—tell promoters that recommending or touting stocks constitutes protected speech. *See, e.g.,* SEC Cyberfraud Website ("Because the U.S. Constitution's First Amendment protects freedom of speech, the SEC cannot simply prohibit newsletters from recommending or touting particular stocks.").  This too would not put Rybarczyk on notice that his actions were criminal.

48

***Fourt***h, there is nothing in the legislative history of Section 1348 that suggests that it would cover the conduct alleged in this Indictment. In the wake of the Enron scandal, when signing the law in 2002, President Bush stated, "No more easy money for *corporate criminals –* just hard time," and, "No *boardroom* in America is above or beyond the law." (emphasis added).[40] Senator Leahy described the new law, stating that the provision was "intended to provide a flexible tool to allow prosecutors to address the wide array of potential fraud and misconduct which can occur *in companies* that are publicly traded. 148 Cong. Rec. S7418 (July 26, 2002) (statement of Sen. Leahy) (emphasis added). These statements make clear that the law was intended to provide prosecutors with a broad tool to reach securities fraud engaged in by financial professionals and corporate executives. Rybarczyk is neither.

In short, the failure of securities regulators to establish any rule even remotely applicable to the charged conduct—when coupled with the dearth of case law analyzing Section 1348 in this context—would not inform a reasonable person operating a Twitter account that a failure to disclose stock sales—without a corresponding duty—would amount to a criminal scheme to defraud under federal law.[41] For all these reasons, the application of Section 1348 to a Twitter

---

[40] Elisabeth Bumiller, *Corporate Conduct: The President; Bush Signs Bill Aimed at Fraud In Corporations,* THE NEW YORK TIMES (July 31, 2002), https://www.nytimes.com/2002/07/31/business/corporate-conduct-the-president-bush-signs-bill-aimed-at-fraud-in-corporations.html.

[41] The only criminal case even remotely comparable to the current case is *United States v. Gallagher*, 22-CR-00122 (S.D.N.Y. 2022), which alleged that Gallagher failed to tweet out that he was selling microcap stocks that he touted. But Gallagher was not charged until October 2021. All of the tickers charged in this Indictment (save two) involved conduct that occurred *prior* to October/November 2021. In addition, although Gallagher was charged by criminal complaint under Section 1348 as well as other statutes with causing a loss of well over $1mln for allegedly failing to disclose his stock sales (*see* 21-MJ-05287 in SDNY), by the time the Information was filed two months the government had retreated, dropping the Section 1348 charge, agreeing to a plea agreement with a loss of *just $21,000*, and abandoning their entire "scalping" theory. The filed Information and plea agreement was related to a single misrepresentation involving a single stock, for which Gallagher received home confinement.

commentator's failure to disclose stock sales would undoubtedly be a "novel construction of a criminal statute" that would violate Rybarczyk's due process rights.

**D.      The "Time-Honored" Rule of Lenity Requires Dismissal of the Indictment.**

Finally, to the extent this Court finds any ambiguity in the application of Section 1348 to the charged conduct, which it should, the rule of lenity—a "time-honored interpretive guideline" which has been "applied many times to construe ambiguous statutes against imposing criminal liability"— mandates the dismissal of the charges here. *See Cargill v. Garland*, 57 F.4th 447, 469-71 (5th Cir. 2023) ("rule of lenity applies if the statute is ambiguous"); *see also United States v. Cooper*, 38 F.4th 428, 434 (5th Cir. 2022).

As set forth in the *Cargill* case, there are two competing standards for whether a statute is ambiguous enough to trigger the rule of lenity. The first standard asks whether there is a "reasonable doubt" as to a statute's meaning, while the second standard invokes a higher hurdle, asking whether there is "grievous ambiguity" in the statute. *Id*. at 469. It does not matter which standard is applied here, as there is little doubt that Section 1348, and particularly subsection (1), is grossly ambiguous, failing to provide anyone with any guidance or semblance of notice as to its contours. And, at least in how it appears to be applied by the Department of Justice in this case, the statute is being used to force a radical departure from how securities laws have traditionally been analyzed over the past nearly 90 years.

For this reason too, the charges against Rybarczyk and the other Defendants must be dismissed.

50

**VI.    INDICTMENT SHOULD BE DISMISSED BECAUSE IT VIOLATES THE FIRST AMENDMENT, BOTH "AS-APPLIED" TO THE CONDUCT HERE AND FACIALLY.**

Other than a handful of alleged affirmative misstatements in the Indictment, the Government is attempting to criminalize Twitter users' opinions concerning various stocks based on the novel theory that such speech is part of a scheme to defraud.

This protected speech includes banal statements like "CEI looking good," "$DATS $30+ maybe $50 or $100," and "$BBI Bullish!!!!!!" The Government "fraud" dragnet also includes statements of fact such as "[a]dding CEI with [DEEL] that's cheap AF" and "I just added GTT with Ultra," based on the theory that they allegedly omit the speakers' subjective intent to sell stocks. Overall, as the attached chart provides (*see* Exhibit A), the Government quotes dozens of instances of these kinds of opinions, generic touts, puffery, and omissions of intent.

But if Section 1348 stretches to criminalize this kind of speech, there will be no limit to the manner of speech that could be criminalized—whether it is purported affirmative misrepresentations, banal opinions on whether a stock is "looking good," or omissions concerning precisely when a person is selling or intends to sell stock. This uncertainty in the application of Section 1348, and its concomitant speech-chilling effects, violates the First Amendment both on an "as-applied" basis as to Rybarczyk, as well as on a facially overbroad basis generally. *See Serafine v. Branaman*, 810 F.3d 354, 363 (5th Cir. 2016) ("Although litigants are permitted to raise both as-applied and overbreadth challenges in First Amendment cases, the lawfulness of the particular application of the law should ordinarily be decided first" and the courts generally "proceed to an overbreadth issue" only if it "determined that the statute would be valid as applied.").

**A.    Section 1348 is unconstitutional "as applied" to the conduct of Rybarczyk**

51

**and his co-Defendants as alleged in the Indictment.**

"[A]s a general matter, the First Amendment means that Government has no power to restrict expression because of its message, its ideas, its subject matter, or its content*." Ashcroft v. American Civil Liberties Union*, 535 U.S. 564 (2002) (internal quotation marks omitted). Because of this, the Constitution "demands that content-based restrictions on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004).

While "commercial speech" is not entitled to as broad constitutional protections as non-commercial speech, the vast majority of the Tweets identified in the Indictment here are not "commercial speech" because that they did not propose a "commercial transaction." *See Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) ("There is no doubt that the AFS 'Tupperware parties' the students seek to hold 'propose a commercial transaction,' which is the test for identifying commercial speech." (*quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *see, e.g.*, ¶¶ 84 ("$ABVC Soaked a ton between yesterday and a few fills when I got up. High conviction play $6+ first target."); 46 ("$GTT 110M market cap with 2B+ deal in place").

The above-noted principles—as the SEC concedes on their own website—protect an individual's constitutional right to publicly recommend or tout a stock. *See, e.g.,* SEC Cyberfraud Website ("Because the U.S. Constitution's First Amendment protects freedom of speech, the SEC cannot simply prohibit *newsletters* from recommending or touting particular stocks.");[42] SEC Website on Social Media ("Touting isn't illegal as long as the newsletters

---

[42] *Tips for Checking out Newsletters*, SEC.GOV (Feb. 27, 2009), https://www.sec.gov/investor/pubs/cyberfraud/newsletter.htm.

disclose who paid them, how much they're getting paid, and the form of the payment, usually cash or stock.").[43] And, as described, individuals also have a First Amendment right to band together with others to purchase stocks, *even if* their intent is to drive up the price of that stock. It is because of this that Section 1348—as applied to Rybarczyk's conduct—is overbroad as it limits his ability to fully exercise his First Amendment right to tweet about stocks.

More specifically, the crux of the Indictment's allegations against Rybarczyk focus not on what he *did* tweet, but rather on what he *did not* tweet—namely, his "intent to sell" stock and his stock sales. But this failure to disclose an "intent to sell" is not actually the Government's theory of liability. Rybarczyk and the other Defendants *did* Tweet out their intent to sell. Rather than appearing to be disinterested advisors, the Defendants fully informed their followers that they owned the particular stocks they discussed on social media, *see, e.g.*, Ind. ¶¶ 26, 34, 35, 51, 79, thereby indicating a then-present intent to sell that stock later for profit. That is the whole purpose of trading stocks—to make money. This principle applies doubly here, where 1) the Defendants were day-traders, meaning that they rapidly moved in and out of positions, seldom holding stocks for the medium or long-term and 2) the Defendants posted pictures of themselves driving luxury vehicles (obviously the fruit of their stock sales).

Instead, what the Indictment here is *actually* attempting to criminalize is not the failure to disclose an intent to sell—the Defendants did that—but rather an alleged failure to inform other Twitter users of *exactly when*, in real-time, they would be selling their shares. But such a rule is unworkable for multiple reasons, including because the specific timing of a trade is largely dependent upon market forces outside a trader's control. As an example, if a trader tweets out a

---

[43] *Updated Investor Alert: Social Media and Investing – Avoid Fraud,* SEC.GOV (Nov. 12, 2014), https://tinyurl.com/2p8t7shd.

positive statement about a stock, and the price then rises thereby allowing the trader to sell, the timing of that sale is dependent entirely on the *post*-Tweet price movement of the stock. Likewise, if a trader tweets a positive statement about a stock, and then the stock price does nothing or even declines in value, the trader may hold his shares *or* sell a portion to lock-in any earlier profits and prevent future losses. Under the Government's proposed rule, a trader would have to keep updating his Twitter followers—to whom he has no fiduciary or other type of duty—every step of the way simply because of an earlier positive tweet, telling them precisely how he will react to certain price movements and exactly when he will sell his stock. If a trader does not do that, he risks being charged with criminal fraud.

Such a standard is not practicable—even insiders are not required to publicize their sales in advance—and unconstitutional because it compels speech—the forced disclosure of stock sales or an intent to sell—without providing a trader with any guidance or framework on how to effect such disclosures on social media.[44] Must a trader who publicly Tweets about a stock disclose his future sales *before* he chooses to sell, thereby taking a risk that his disclosure will tank the stock for everyone, including himself, or is it sufficient to inform his followers *after* the sale—as company executives do—but then risk being deemed a fraud (and charged criminally)

---

[44] When the Government seeks to compel an individual "to speak a particular message," as the DOJ does here by requiring Rybarczyk to tweet out his stock sales in real-time, the Government "alter[s] the content of [their] speech,' "and engages in content-based regulation. *See Slattery v. Cuomo*, 531 F. Supp. 3d 547, 562 (N.D.N.Y. 2021) (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). A court is to "apply the most exacting scrutiny" to such restrictions on speech. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). Under such "strict scrutiny," a court considers "whether a law is narrowly drawn to serve a compelling governmental interest." *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014). "The statute must use the least restrictive means to achieve its ends." *Id.* (quoting *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000)). The DOJ's approach here, and the approach of Section 1348 generally, completely fails the "strict scrutiny" test because there are no limits to the disclosures that Rybarczyk—an amateur trader—needs to make.

54

for failure to disclose a sale in advance? And if a trader chooses not to disclose his sales post-tweet, at what point is it safe to legally sell? Is it sufficient for a trader to wait an hour, or a day, or a week before selling stock? Such an amorphous standard—which leaves a trader guessing as to when his conduct stops becoming fraudulent—effectively imposes an indefinite lock-up period that exceeds that of insiders and directors.

The end result is obvious. The Government's proposed rule of forced sale disclosure will chill traders' speech because traders have no guidance on when—in light of an earlier positive tweet—a failure to disclose a trade may be considered fraud. Instead of risking criminal fraud charges by tweeting in close relation to a sale, a reasonable trader will *not* Tweet at all for fear that an overly aggressive Government, utilizing a statute with no clear guardrails or limits, and which purports to apply to everyone, fiduciary or not, will criminalize First Amendment protected speech under a novel theory of fraud by *failing* to Tweet. It is for this reason that "as-applied" to the conduct alleged here, Section 1348 violates Rybarczyk's First Amendment right to tweet about stocks as he sees fit. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("where a vague statue abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms).

### B.   Section 1348 is facially overbroad as a substantial amount of protected speech will be chilled by its enforcement.

Even if constitutional "as applied" to Rybarczyk—but to be clear, Section 1348 is not—the statute is also facially overbroad. "A statute is overbroad if in banning unprotected speech, a substantial amount of protected speech is prohibited or chilled in the process." *United States v. Scruggs*, 714 F.3d 258, 267 (5th Cir. 2013) (quoting *United States v. Brooks*, 681 F.3d 678, 697 (5th Cir. 2012)); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010).

The first step in an overbreadth analysis is to "construe the challenged statute." *See Stevens*, 559 U.S. at 473. Section 1348, and subsection (1) in particular, creates "a criminal prohibition of alarming breadth." *Id*. at 474. In that regard, subsection 1 criminalizes a "scheme or artifice – to defraud *any* person in connection with … *any* security …". Its application could be limitless. As examples:

- A financial commentator who likes a large, liquid, blue-chip stock but sells the stock shortly after a positive tweet in order to buy a house? He could be a fraudster under Section 1348 if he intentionally did not disclose his intent to sell at the time of his tweet.

- A golf club member who touts the virtues of a stock to one of his golfing buddies but also realizes that he needs to meet a margin call and therefore sells the stock? He could be a fraudster if he intentionally did not disclose his intent to sell.

- A Twitter user who loves a stock and tells his followers about the stock, but also believes that the stock has appreciated in value too quickly, so he sells portions of it to lock in profits? He is a fraudster if he intentionally did not disclose his intent to sell.

- A hedge fund trader who "talks his book" at a conference to drum up interest in a stock and prove his *bona fides* as a stock prognosticator, and then, when the price of the stock he discussed increases, he then sells a portion of his holdings in order to return capital to his investors? He is a fraudster if he intentionally did not disclose his intent to sell.

This broad application of Section 1348 was by design. As the Congressional record from 2002 makes clear, the entire point of Section 1348 was to be overbroad[45]:

> This provision would create a new 10-year felony for defrauding shareholders of publicly traded companies. The provision would supplement the patchwork of existing technical securities law violations with a more general and less technical provision, with elements and intent requirements comparable to current bank fraud and health care fraud statutes. **It is meant to cover any scheme or artifice to defraud any person in connection with a publicly traded company.** The acts terms are not intended to encompass technical definition in the securities laws, but rather are intended to provide a flexible tool to allow prosecutors to

---

[45] *Legislative History of Title VIII of HR 2673: The Sarbanes-Oxley Act of 2002,* GOV'T. PUBLISHING OFFICE (July 26, 2002), https://www.govinfo.gov/content/pkg/CREC-2002-07-26/html/CREC-2002-07-26-pt1-PgS7418.htm.

address the wide array of potential fraud and misconduct which can occur in companies that are publicly traded. Attempted frauds are also specifically included.

In short, the all-encompassing language of Section 1348(1) includes a wide-range of speech that is constitutionally protected. And while the Government may counter that the reach of the statute to only criminal conduct is made clear because the statute mandates that a defendant "acted with the specific intent to defraud," the facts of this case make plain that for the Government, this specific intent requirement imposes no such barriers because the specific intent to defraud *may* be found simply by not disclosing stock sales in close proximity to a tweet. *See, e.g., United States v. Brooks*, 681 F.3d 678, 698 (5th Cir. 2012) (Court approved of jury instruction that defined "specific intent to defraud" as meaning to "*specifically deceive* or cheat someone.").

For these reasons, Section 1348(1) is facially overbroad as it prohibits significant constitutionally protected speech, and therefore, the Indictment must be dismissed.

## VII. MOTION TO DISMISS TITLE 18, UNITED STATES CODE, SECTION 1348(2) FOR FAILURE TO ALLEGE THAT THE SOCIAL MEDIA POSTS WERE "IN CONNECTION WITH" A SECURITIES TRANSACTION

Title 18, United States Code, Section 1348(2) requires that any scheme or artifice to defraud that includes "false or fraudulent pretenses, representations or promises," be made "*in connection with the purchase or sale* of … any security." This requirement is identical to the language contained in the 1934 Exchange Act. *See* Title 15, United States Code, Section 78(j)(b) (making it unlawful to, "in connection with the purchase or sale of any security," use any "manipulative or deceptive device.").

Under Section 10(b), an alleged misstatement or omission is made "in connection with the purchase or sale of any security" when, among other factors, it is "public[ly] disseminat[ed] in a document ... *on which an investor would presumably rely*[.]" *S.E.C. v. Pirate Inv'r LLC*, 580

57

F.3d 233, 249 (4th Cir. 2009); *see also S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc) ("[w]here the fraud alleged involves public dissemination in a document ... on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission."); *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 965 (2d Cir. 1993); *accord Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000) (remanding case to district court to determine whether the alleged misrepresentations were material and publicly disseminated in a reliable medium). At its core, the "in connection with" standard is "about notice" and "protects these unknowing speakers from liability and ensures that there is a sufficient nexus between the misrepresentations and the securities sales that they induce . . . . ." *Pirate Inv'r*, 580 F.3d at 250–51 (emphasis added).

Of course, when communications are made in prospectuses, company filings, investor and analysis research reports, or other mediums that have a strong indicia of reliability, the "in connection with" standard is easily met. But here, Rybarczyk and the other Defendants allegedly disseminated their false statements and omissions on social media platforms such as Twitter and Discord, which are known to be rife with misinformation and falsities. In addition, Rybarczyk and the others were not company insiders; they were day traders tweeting largely about their own stock positions, their opinions on short-term price increases or decreases in a stock, and their pronouncements that they had added or were holding stock. Because of this, no actual investor would presumably rely on the tweets or Discord chats to make investment decisions, and therefore, the statements (and omissions) were not "in connection with the purchase or sale" of a security as required under Section 1348(2).

58

**VIII.   MOTION TO DISMISS COUNTS 16 (NAKD) AND 17 (EZFL) FOR FAILURE TO ALLEGE FRAUD AGAINST RYBARCZYK.**

As set forth above, to be sufficient pursuant to Rule 7(c)(1), an indictment must allege the facts and circumstances of an offense "with sufficient clarity and certainty" to "enable the accused to prepare his defense and to . . . invoke the double jeopardy clause in any subsequent proceeding." *United States v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013) (citation omitted). Where the indictment fails to state an offense, dismissal of the defective charge is appropriate. *United States v. Fontenot*, 665 F.3d 640, 642 (5th Cir. 2011).

Here, Counts 16 (NAKD) and 17 (EZFL) of the Indictment must be dismissed because the Indictment provides insufficient factual allegations setting forth that Rybarczyk's conduct met each and every element of Section 1348, as charged. In fact, Counts 16 and 17 allege *no* facts or circumstances at all concerning what conduct Rybarczyk allegedly engaged in that the grand jury considers to be securities fraud for either NAKD or EZFL—the Indictment simply lists the name of the security, the Defendants charged in the count, and the approximate dates of the fraud.

There may be instances where such a barebones indictment would suffice under Rule 7. This, however, is not one of them. The paucity of allegations leaves Rybarczyk unable to prepare his defense because of the lack of any detail in the Indictment. Is the fraud based on an alleged omission, in that Rybarczyk did not disclose his stock sales? If so, the defense needs to know in order to prepare for trial by analyzing the various tweets and trades that occurred in this time-frame. Is the fraud based on a material misrepresentation? If so, the defense needs to know in order to research whether the tweets were factually true or not, and whether the tweets would be material. Are any victims alleged to have purchased the security based on a tweet or statement by Rybarczyk? If so, the defense needs to know in order to attack any assertion of materiality.

Further compounding the issue is the fact that unlike with other securities, the fraud in Counts 16 and 17 is alleged to have occurred over a nearly *two-month* time-period. There are simply too many trades and tweets in that lengthy time-period to properly ascertain what the Government's theory of the fraud is and how Rybarczyk can defend against it.

Thus, because Rybarczyk cannot possibly prepare his defense without a single fact telling him what the charges are based on, Counts 16 and 17 should be dismissed.

IX.    **MOTION TO DISMISS COUNT 1 – TITLE 18, UNITED STATES CODE, SECTION 1349 - FOR FAILURE TO ALLEGE THAT RYBARCZYK WAS A MEMBER OF ANY CONSPIRACY**

A conspiracy is, at its core, a knowing agreement by two or more people to commit a crime. An agreement "may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). Here, the Indictment fails to allege that Rybarczyk agreed with others to commit securities fraud because: 1) he was not in the leadership of Atlas trading during the time period of the conspiracy and relatedly, 2) none of the communications between Rybarczyk and the other Defendants as alleged in the Indictment are criminal in nature.

***First***, the Indictment alleges a conspiracy from January 2020 to April 2022. And while all the other Defendants were involved in the Atlas Trading Discord, Rybarczyk himself left his administrative role in Atlas Trading by 2018 to start his own trading chatroom called Sapphire Trading. And while Rybarczyk may have technically remained a "member" of Atlas Trading thereafter as the Indictment alleges, there were more 250,000 members, and certainly not every person was a co-conspirator. Ind. ¶2.

60

***Second***, the allegations in the Indictment confirm that Rybarczyk was not part of any criminal conspiracy because there are just a few allegations concerning any of his interactions with the other Defendants, and none of them are criminal:

- <u>Paragraph 24</u>: Rybarczyk edited a Tweet for co-defendant Deel and promised to retweet the tweet after Deel himself published it.

- <u>Paragraph 29</u>: Although the Indictment claims that Deel and Rybarczyk "respectively" posted "false and misleading information about SXTC on Twitter and Atlas Trading Discord" while continuing to sell shares, there are no specifics as to what that information was, why it was false, and whether they coordinated their tweets.

- <u>Paragraph 45 and 46</u>: On March 1, 2021, Rybarczyk tweeted about GTT and co-defendant Knight replied "Oh, there it is! Tweet, tweet, tweet. There's the tweet." In the next paragraph, Knight pondered whether Rybarczyk would sell his shares of GTT given the modest uptick in price. Knight did not know. These allegations confirm that Rybarczyk was *not* in any conspiracy with Cooperman, Knight, and Deel because Rybarczyk had not told them what he was doing.

- <u>Paragraph 51</u>: This paragraph alleges that Matlock "<u>falsely</u> claimed in Atlas Trading Discord" that he "just added GTT with Ultra (Rybarczyk)," further confirming that Matlock and Rybarczyk were not coordinating their trades.

- <u>Paragraph 79</u>: With respect to the pump and dump of UPC, the Indictment alleges a single tweet by Rybarczyk, and there are no allegations that he coordinated that tweet with anyone. In fact, as alleged in paragraphs 77 and 78, Rybarczyk's "co-conspirators" had already sold their shares at the time of the tweet.

- <u>Paragraph 82</u>: Rybarczyk is alleged to have pumped and dumped ABVC all by himself.

- <u>Paragraph 97(b) and (c)</u>: Rybarczyk is discussed only as thanking other co-Defendants for "mentioning" the stock CEI (in their previous tweets). Rybarczyk also, allegedly, falsely claims that he was "full" on CEI as well. There are no allegations of collusion or coordination or even knowledge of anything illegal.

In short, there is not a single substantive allegation of any illegal agreement or coordination between Rybarczyk and any of his co-Defendants. This is hardly surprising given that Rybarczyk had left Atlas Trading's Discord more than a year before the conspiracy is even alleged to have begun. For this reason, Rybarczyk must be dismissed from Count One of the Indictment.

## CONCLUSION

For all the reasons set forth above, the Indictment against Rybarczyk must be dismissed.

Respectfully submitted,

**HILDER & ASSOCIATES, P.C.**

/S/ *Philip H. Hilder*
Philip H. Hilder
Texas Bar No. 09620050
Q. Tate Williams
Texas Bar No.: 24013760
Stephanie K. McGuire
Texas Bar No. 11100520
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
philip@hilderlaw.com
tate@hilderlaw.com
stephanie@hilderlaw.com

Eric Samuel Rosen
Freedman Normand Friedland LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel: (617) 977-4163
erosen@fnf.law

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, a true and correct copy of the above and foregoing Motion for Leave to File Additional Pretrial Motions was served on all counsel of record via ECF, certified mail, return receipt requested, facsimile, electronically, or hand delivery.

/s/ *Q. Tate Williams*
Q. Tate Williams

62