UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS. § | NO. 4:22-cr-00612-3 |
| § | |
| JOHN RYBARCZYK § | |

_____

### RYBARCZYK'S 2nd JOINT MOTION TO DISMISS
_____

TO THE HONORABLE ANDREW HANEN, UNITED STATES DISTRICT JUDGE:

John Rybarczyk ("Rybarczyk"), Defendant, joined by Defendants Hrvatin, Hennessey, Matlock, Deel, Cooperman, and Constantinescu, respectfully submits this second motion to dismiss the Superseding Indictment ("Indictment") pursuant to Fed. R. Crim. Pro. 12(b)(3)(B)(v) for failure to state an offense under 18 U.S.C. §§ 1348, 1349, or 2, based on the recent Supreme Court ruling in *Ciminelli v. United States*, 21-1170, 598 U.S. 306 (May 11, 2023), and the more recent Fifth Circuit opinion in *United States v. Greenlaw*, --- F.4th ----, 2023 WL 4856259, *7-8 (5th Cir. Jul. 31, 2023).

### I. REQUEST FOR LEAVE TO FILE

<u>Motions to Dismiss were due on May 12, 2023. Dkt. 254.  However, the cases that form the basis of this motion were not available at that time</u>.  *Ciminelli* was decided the day before pretrial motions were due in this matter, thereby not giving defense counsel sufficient time to incorporate this ruling into the motions, although the ruling was cited briefly in a footnote in Rybarczyk's reply brief. In addition, subsequent rulings by district courts applying *Ciminelli* now make clear that *Ciminelli* directly governs situations like that here, where alleged victims were allegedly deprived of economically valuable information, in this case the trading decisions of

1

individuals such as Rybarczyk and others, as a means of informing their own trading decisions. Finally, *Greenlaw* was decided more than two months after the motions to dismiss were fully briefed (the petition for rehearing and response, filed on August 18, and 28, 2023 remain pending). Based on all these developments, this motion could not have been filed at the time motions to dismiss were filed in early May 2023, and Rybarczyk respectfully requests the Court grant him leave to file this Second Motion to Dismiss.

## II. MOTION TO DISMISS

A. **In *Ciminelli*, the Supreme Court rejected the government's argument that the right to valuable "economic information" in making decisions concerning proposed transactions was not a traditional property right protected by the federal fraud laws.**

In *Ciminelli*, the Supreme Court overturned a decision of the Second Circuit Court of Appeals, and unanimously held that the federal fraud statutes protect and apply only to "traditional property rights." *Ciminelli*, 598 U.S. at 309. The facts of *Ciminelli* are instructive here. *Ciminelli* was a contractor who paid a lobbyist $100,000 to $180,000 each year to help his company obtain state construction contracts in New York. The lobbyist, in turn, worked together with an employee of the state-funded Fort Schuyler Management Corporation to develop a set of bid criteria that effectively served to steer state contracts to *Ciminelli*. After this scheme was uncovered, *Ciminelli* and others were charged with wire fraud under the theory that Fort Schuyler was deprived of "potentially valuable economic information that it would consider valuable in deciding how to use its assets"—namely, that *Ciminelli* had paid a lobbyist to help fashion bid criteria that steered contracts to *Ciminelli*. *Id*. at 308. The district court defined "economically valuable information" as information "that affects the victim's assessment of the benefit or burdens of a transaction, or relates to the quality of the goods or services received or the economic risks of the transaction." *Id*. fn. 4 ("the right to information necessary to make informed economic decisions, while perhaps

2

useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest."). On these facts, the Supreme Court reversed, holding that the right to control one's assets through the receipt of "economically valuable information" is not a traditional property right protected by federal fraud statutes.[1]

### B. In *United States v. Nordlicht*, the district court, relying on *Ciminelli*, vacated the federal fraud convictions of investment managers who failed to provide bondholders with accurate information.

In *United States v. Nordlicht, et al*., 16-cr-640-BMC, 2023 WL 4490615 (E.D.N.Y. Jul. 12, 2023), the Court reversed the wire fraud convictions of two executives of the Platinum Partners investment funds. Although the fact pattern is complicated—the defendants made misrepresentations to non-affiliated bondholders in an effort to get those bondholders to tender their bonds—the district court's holding is not. At issue was whether an intent to harm the bondholders was necessary to obtain convictions under Title 15 securities fraud statutes or Title 18 fraud statutes. The Court first denied the Rule 29 motion with respect to securities fraud, holding that under Title 15, "intent to harm is not part of the scienter element of securities fraud," and instead, it was "enough for the defendants to have intended to "deceive" or "manipulate" the bondholders." *Id*. at 5. However, the Court then granted the Rule 29 motion with respect to wire fraud, which requires "an intent to deprive the victim of money or property." *Id*. Relying on *Ciminelli* and its rejection of the "right-to-control" theory, the district court held that because there was no intent to defraud the victims—rather, the alleged victims had effectively been deprived of

---

[1] Although *Ciminelli* was convicted under wire fraud, not Title 18 securities fraud, there cannot be any dispute the analysis of the two statues is the same. *See, Greenlaw*, 2023 WL 4856259 (analyzing both wire and Title 18 securities fraud under the same rubric).

information that could have alter their decision on whether or not to tender bonds—a federal fraud conviction cannot lie.[2]

    **C.    The Fifth Circuit's recent decision in *United States v. Greenlaw* found that the "intent to defraud" element of federal fraud statues requires both an intent to deceive *and* an intent to cause some harm to result from the deceit.**

On July 31, 2023, the Fifth Circuit issued its decision in *Greenlaw*, which focused, amongst other issues, on whether the district court's "intent to defraud" instruction was correct. *Greenlaw*, 2023 WL 4856259, * 1. Specifically, the district court had instructed the jury—based on the Fifth Circuit's current pattern jury instruction—that a "specific intent to defraud" means a "conscious, knowing intent to deceive *or* cheat someone." *Id*. The Fifth Circuit concluded that the pattern jury instruction was erroneous.

Specifically, the Court noted that "under the fraud statutes, the proper question is 'whether the victims' property rights were affected by the misrepresentations.'" *Id*. at 12. In determining that the pattern instruction was wrong, the Court explained:

> As to the "intent to defraud" instruction, we agree with Appellants that the disjunctive "or" makes it a misstatement of law. Under a plain reading of the instruction given, the jury could find that the Government proved an "intent to defraud" if Appellants merely exhibited a "conscious, knowing intent to deceive . . . someone." But we have already explained that deception is not synonymous with depriving another of their property interests. The Government provides no

---

[2] Other courts too have relied on *Ciminelli*, at least in part, to vacate fraud convictions. On September 1, 2023, Judge Chen of the Eastern District of New York reversed the convictions of two individuals indicted and convicted as part of a scheme to pay foreign commercial bribes in soccer. *See United States v. Full Play Group and Hernan Lopez*, 15-CR-252-PKC (E.D.N.Y. Sept. 1, 2023). Although the court primarily focused on *Percoco v. United States*, 598 U.S. 319 (2023)—a Supreme Court decision also issued on May 11, 2023, that sharply limited the reach of the federal honest services fraud statute—the district court also cited *Ciminelli* in overturning the defendants' convictions. Specifically, the district court cited to the portion of *Ciminelli* that reiterated the Supreme Court's castigation of the government for consistently attempting to expand the reach of the federal fraud statutes—"federal prosecutors may not use property fraud statutes to set standards of disclosure and good government for state and local officials" and cautioned against "criminaliz[ing] traditionally civil matters and federaliz[ing] traditionally state matters." *Id*. at 316.

argument refuting this construction of the intent to defraud language which is directly at odds with our caselaw holding that a jury cannot convict a defendant under the fraud statutes based on deceit alone. Indeed, it has long been our understanding that an "'intent to defraud' requires 'an intent to (1) deceive, *and* (2) cause some harm to result from the deceit.'" *Evans*, 892 F.3d at 712 (emphasis added) (quoting *United States v. Moser*, 123 F.3d 813, 820 (5th Cir. 1997) (quoting in turn *United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir. 1996))); *Ratcliff*, 488 F.3d at 645–49.

*Id*. In reaching this conclusion, the Fifth Circuit cited favorably to the Eleventh Circuit's recent decision in *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir.), *as rev'd* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). In *Takhalov*, the defendants tricked victims into visiting a nightclub by hiring women to pose as tourists outside the club. These "tourists" then lured visiting businessmen into the nightclub, where they purchased very expensive drinks for their new girlfriends. The women, obviously, lied to the businessmen about both who they were and about their compensation by the nightclub. The Eleventh Circuit held that these lies to lure dupes into the club —although certainly deceptive—were not alone sufficient to convict the defendants of wire fraud because the businessmen did not suffer any harm from this deception. Indeed, once inside the bar, the businessmen received exactly what they paid for—namely, expensive drinks and the companionship of a woman. They got the benefit of their bargain as the Eleventh Circuit made clear.

    **D.**    **Under both *Ciminelli* and *Greenlaw*, the Government has not pled a valid theory of securities fraud under Title 18, United States Code, Section 1348, and therefore, the Indictment must be dismissed.**

*Ciminelli* and *Greenlaw* are instructive here because, taken together, they demonstrate that the Government's theory of securities fraud is flawed, and that as a result, the Indictment fails to alleged an offense and must be dismissed.[3]

---

[3] As has been briefed previously, when an indictment fails to satisfy the requirements of Rule 7, Rule 12 of the Federal Rules of Criminal Procedure empowers a defendant to move to

Specifically, the Indictment details how, allegedly, the Defendants hid potentially valuable economic information from their followers of social media in touting stocks:

- Paragraph 1: "To carry out the scheme, the defendants (1) purchased shares of a security in their trading accounts; (2) posted messages on social media platforms with **false, positive information about the security—including as to, among other things, the defendants' position in the security, how long the defendants intended to hold the security, the defendants' view that the security would increase in price, and the price the security could reach**—to induce other investor to buy the security and artificially drive up its price, and (3) secretly sold their own shares of the security at a higher price to secure a profit for themselves, at or around the time they posted messages to induce other investors to purchase the same security and concealed their intent to sell.

- Paragraph 15: Certain of the defendants, for example, sought to mislead their Twitter followers and members of Atlas Trading Discord by, among other things, **falsely representing that they (a) did not sell shares of a security or "dump" shares on their Twitter followers and members of Atlas Trading Discord; and (b) did not "scalp" or secure short term profits at or around the time of their social media posts**."

- Paragraph 17: Indeed, the defendants' efforts to **mislead and conceal material information from other investors concerning the defendants' true trading activity** was critical to the continued success of the scheme …".

---

dismiss the indictment due to a "defect" therein, including a "lack of specificity" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B). Where the indictment fails to state an offense, dismissal of the defective charge is appropriate. *United States v. Fontenot*, 665 F.3d 640, 642 (5th Cir. 2011). Upon a defendant's motion to dismiss, the Court must accept the factual allegations on their face, *see Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n.16 (1952), but is not bound to accept as true a legal conclusion couched as a factual allegation. *See Gonzalez*, 686 F.3d at 129 ("Stating that an act is in violation of' a cited statutory section 'adds no factual information as to the act itself.") (*quoting United States v. Camp*, 541 F.2d 737, 740 (8th Cir. 1976)). Because Rule 7 codifies constitutional safeguards, the "precise manner in which an indictment is drawn cannot be ignored." *Sanabria v. United States*, 437 U.S. 54, 65–66 (1978); *see also United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("[T]he indictment must be considered as it was actually drawn, not as it might have been drawn."). At the pretrial stage, a court may not weigh the sufficiency of the *evidence* underlying an indictment. The court, however, may evaluate the sufficiency of the Government's *allegations,* "so that it may decide whether [the facts alleged] are sufficient in law to support a conviction." *Russell v. United States,* 369 U.S. 749, 768 (1962); *see also United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998) (court is required with a motion to dismiss to "take the allegations of the indictment as true and to determine whether an offense has been stated").

- Paragraph 27: At approximately 9:33:16 EST, MALOCK falsely claimed in Atlas Trading Discord how he "grabbed a few SXTC with you," while **he concealed that he was in the process of liquidating his position**.

- Paragraph 58: "On or about May 19, 2021, at approximately 9:57:20 EST, MATLOCK misleadingly claimed in a post in Atlas Trading Discord that he was "Long SURF with [HENNESSEY] adding here on this pullback . . . ," **without disclosing his intent to sell his own shares**."

Dkt. 134 (emphasis added).

In short, over and over again, the Indictment details how the Defendants gained money, and how they did so by allegedly depriving their twitter followers of potentially valuable economic information—namely, their stock sales, their positions, and their intent to sell—in so doing. Put bluntly, the Indictment clearly alleges that these "victims" were making "discretionary economic decisions" in how to how spend their money on stocks. And while these victims may have wished for more or more *accurate* information concerning the Defendants' own financial positions in deciding whether or not to purchase stock for their own accounts, such a right to potentially "valuable economic information" is not a traditional property right for purposes of the Title 18 fraud statutes.

The Government's witness list, and the FBI 302 reports produced in discovery, confirm this reading of the Indictment. All of the "victims" here will testify, in some substance, that they would not have purchased stock *had they known* the economically valuable information concerning the Defendants' own stock sales. See below for excerpts from the FBI 302 reports:

> Luke Multanen: "If MULTANEN had known @Ultra_Calls was selling ABVC shares at or around the time of the attached tweets, MULTANEN definitely would not have bought any ABVC shares. If @Ultra_Calls was selling ABVC shares while encouraging others to buy shares, MULTANEN would not have bought the ABVC shares, because that meant @Ultra_Calls viewed his/her followers as his/her "exit liquidity". If @Ultra_Calls tweeted something like 'I'm still loading' or tweeted something to indicate s/he was still buying, when in actuality @Ultra_Calls was selling shares, that would be misleading and unethical at the very least. Telling people to buy shares when you are actually selling shares was essentially the biggest

red flag MULTANEN could think of. If MULTANEN knew that someone was doing that, he would not buy the stock."

James Navia: "If Navia had known that PJ Matlock and Hugh Henne were no longer holding TRCH he would not have purchased more. Navia closed out his position, selling all of his TRCH trades on March 3 and 4, 2021 to mitigate his losses."

Chad Surdi and his wife: "They thought these were good trades or investments based on the comments. They were encouraged to buy the dips. Surdi believed the tweets. It would have been important for Surdi to know if those tweeting were selling their shares when they were encouraging others to buy. It would have been important for Surdi to know if they were coordinating to purchase shares prior to the tweets and discussion on Atlas Trading. Surdi would not have followed them if he had known."

Giovanni Moriello: He "stated he has traded quite a bit of stock based on calls made by Twitter hand @Ultra_Calls. Moriello stated had he known that @Ultra_Calls was dumping stocks that he was suggesting others buy, he would not have purchased the stock."

Chelsea Bishop: She "believed that @ohheytommy was actually doing what he said in is Tweets and had she known that he was selling or had already sold his shares when he said he was holding shares she would not have purchased the stock."

*Greenlaw* confirms that what the Government alleges in the Indictment is not a crime because under *Greenlaw*, *citing Takhalov*, the harm visited on people must come *from* the deceit. The Indictment certainly alleges that the victims were induced to purchase stocks because of the alleged deception by the Government, just like the businessmen in *Takhalov* were lured into the nightclub based on the false representations of the prowling "tourists." However, like the businessmen in *Takhalov* who received the benefit of their bargain once inside the nightclub—high priced drinks and female companionship—the "victims" here received exactly what they bargained for—free trading shares that they could buy or sell whenever they pleased. Even if the "deception" might have influenced the victims' initial discretionary decisions to purchase the shares, but the Government does not allege that any victims suffered actual harm *because of* the deception.

8

For example, in SXTC, the Indictment purports to allege that the Defendants first engaged in acts of deception, while after those acts of deception, the Defendants sold their share in SXTC, profiting $19,323.83. *See* Dkt. 134 (¶¶21-31). The Indictment does not allege that *any* victim—or any other person, for that matter—was harmed *by that deception*, as is required under *Greenlaw*. The Indictment does not even link any rise in price to the Defendants' alleged conduct or any fall in price to the Defendants' alleged deception. The Indictment simply asserts, in effect, that "victims" purchased free trading shares on the open market based on Defendants' misrepresentations about their own trading and opinions of the stock. Like in *Takhalov* where the businessmen were lured into the uber-expensive nightclub based on misrepresentations by tourists, the victims here were allegedly lured into an open-market for stock based on alleged misrepresentations by the Defendants. Both types of conduct may have been unethical—according to the Government—but the alleged deception was not the cause of any harm to the victims, and therefore, did not violate federal fraud laws. The businessmen could have stopped drinking at any point, and the victims holding the shares could have sold them at any point.

It is important to contrast what is alleged here with how a traditional "pump and dump" scheme operates. In a traditional pump and dump, a "control group" holds all the free trading shares, and therefore, in order to induce people to purchase those shares, the group typically engages in manipulative trading to make it *appear* that there is an active free market for the shares when in fact there is none. Once the manipulation ends, the stock collapses. Thus, it cannot be debated that the lies of the control group caused harm to investors. Here, by contrast, the Indictment alleges no more than a deprivation of economically valuable information. Put simply, assuming that the "victims" were truthful in their interviews with the FBI, they would not have

9

purchased the stock had they known of the Defendants' stock sales. Under *Ciminelli* and *Greenlaw*, this is not a federal crime.

The other stocks in the Indictment contain similar allegations and therefore suffer from the same defect. In TRCH, as another example, the fraud was the alleged lies about Defendants' own trading positions which caused them to reap profits. No victim was harmed by this apparent deception or even by the Defendants' stock sales. *See* Dkt. 134 (¶¶32-42). In GTT, the Defendants failed to inform their followers of their own sales, profiting $199,530. *See* Dkt. 134 (¶¶43-53). And while the Indictment alleges that in the context of GTT Defendant Daniel Knight (now a Government cooperator) proclaimed "we're robbing f*cking idiots of their money," *see* Dkt. 134 (¶49),[4] Knight's statement, in context, simply meant that any "victims" had been deprived of knowing of Knight's true trading intentions. Indeed, that is confirmed in the very next paragraph, where Defendant Cooperman describes purportedly how Rybarczyk used social media—"'he alerts it, and then, like five minutes later all his little minions start, like retweeting it, and saying 'added with him,' so it, like, builds the hype back up. It happens every single time.'" While these individuals—in the view of Knight and Cooperman—may not have purchased stock but for the tweets of Rybarczyk (as alleged), harm to any victim did not result from the alleged deceit. Put bluntly, while the Indictment is clear that the Defendants allegedly profited from their stock sales, the Indictment is decidedly unclear how the deceit alleged—misrepresentations about Defendants' own trading position—directly resulted in harm to victims.[5]

---

[4] Of critical importance, this statement by Dan Knight was made in a private chat room, not on the Atlas Discord server nor in the presence of six of the remaining Defendants.

[5] To the extent that the Government attempts to say that harm occurred because the deceit "artificially" drove up the stock price, that argument can be quickly rejected. *See* Dkt. 134 ¶1. The Indictment alleges only arms-length free market transactions. Putting the word "artificial" in front

10

**CONCLUSION**

For the reasons set forth above, the Indictment must be dismissed because under *Ciminelli* and *Greenlaw*—cases decided after the Indictment was handed down—the allegations contained within are not a crime.

Respectfully submitted,

**HILDER & ASSOCIATES, P.C.**

/S/ *Q. Tate Williams*
Q. Tate Williams
Texas Bar No.: 24013760
Philip H. Hilder
Texas Bar No. 09620050
Stephanie K. McGuire
Texas Bar No. 11100520
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
philip@hilderlaw.com
tate@hilderlaw.com
stephanie@hilderlaw.com

Eric Samuel Rosen
Constantine Economides
Dynamis LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel: (617) 802-9157
erosen@dynamisllp.com

ATTORNEYS FOR DEFENDANT

---

of those transactions does not actually render the trades to be artificial, absent some manipulative trading.

11

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 5, 2023, a true and correct copy of the above and foregoing reply brief was served on all counsel of record via ECF, certified mail, return receipt requested, facsimile, electronically, or hand delivery.

                                                /s/ *Q. Tate Williams*
                                                Q. Tate Williams