UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS. § | NO. 4:22-cr-00612-3 |
| § | |
| JOHN RYBARCZYK § | |

**RYBARCZYK'S REPLY BRIEF IN SUPPORT OF HIS MOTION TO EXCLUDE EXTRANEOUS EPISODES FROM APRIL 2024, TRIAL**

TO THE HONORABLE ANDREW HANEN, UNITED STATES DISTRICT JUDGE:

John Rybarczyk ("Rybarczyk"), Defendant, joined by Defendants Deel, Matlock and Cooperman, respectfully submits this brief in reply to the Government's opposition to his motion to exclude evidence of any alleged fraudulent "episode" *other than* the 19 specified in the Superseding Indictment ("Indictment"), filed at Dkt. 424.

**A. Rule 403 allows Courts to Exclude Episodes as Cumulative or a Waste of Time.**

Rybarczyk's motion was largely premised on Fed. R. Evidence 403, which allows courts to exclude even relevant evidence for numerous reasons, including, as applicable here, "undue delay, wasting time, or needlessly presenting cumulative evidence." Thus, the Government's suggestion that they "*must* be allowed to present if necessary" every one of their chosen 54 episodes is wrong. This Court is entrusted with "wide discretion" both in "determining relevancy and admissibility," *and* in preventing the parties from "needlessly presenting cumulative evidence." *See, e.g., United States v. Hagen,* 60 F.4th 932, 944 (5th Cir. 2023)*; United States v. Sepulveda*, 710 F.2d 188, 189-90 (5th Cir. 1983).

This Court is more than justified in limiting the Government's trial presentation to the already voluminous 19 trading "episodes" alleged in the Indictment, as the 35 additional episodes

1

sought to be introduced are entirely cumulative. Specifically, in an attempt to appear "more than reasonable," the Government contends that in limiting their case just to 54 separate alleged trading episodes "[t]here cannot be a reasonable dispute that such curtailment is both reasonable and in the interests of judicial economy." In so arguing, the Government asserts that the 54 episodes "amounts to roughly 5 to 10 episodes per Defendant with an approximate average of about 8 episodes per defendant." But the Government's arguments are disingenuous.

Exhibit 1 to this reply is a modified version of the Government's Exhibit 1 as attached to their responsive pleading filed at Dkt. 424. As this Court can see, *many* of the Defendants are alleged to have participated in *many* of the episodes. Far from only being "roughly 5 to 10 episodes per Defendant," Mr. Rybarczyk, for example, is alleged to have participated in 43 of the 54 episodes. Defendant Constantin is alleged to have participated in 29 of the 54 episodes. And the other defendants are likewise alleged to have participated in *dozens* of the episodes that the Government seeks to admit at the April 2024 trial: Defendant Hennessey (33 episodes), Defendant Matlock (40 episodes), Defendant Cooperman (43 episodes), cooperating witness and Defendant Sabo (44 episodes), Defendant Deel (45 episodes), Defendant Hvartin (17 episodes), and cooperating witness and Defendant Knight (32 episodes). Put simply, far from streamlining anything, the Government's case now *promises* to be unnecessarily cumulative and wasteful, with jurors hearing about similar types of trading and tweeting dozens of times for each of the charged defendants. The Government's sleight of hand here should not be condoned.

**B. The Government's Assessment of the Amount of Time Necessary to Try Each Alleged Pump and Dump is Absurdly Unrealistic**

As this Court is aware, the seven remaining Defendants here strongly dispute that they engaged in any criminal conduct. In fact, that only a single defendant charged in this Indictment

2

has thus far pled guilty is testament to the myriad of legal and factual issues that plague the Government's case, and which must be brought before the jury for each and every trading episode.

       *1. SNOA Trading Episode – May 3, 2021*

The government's reliance on SNOA's stock price increase on May 3, 2021 highlights the many issues that are at play in the 54 chosen trading episodes. In that regard, in arguing that the Defendant's SNOA trading and tweeting amounted to a stock fraud, the Government's brief cites a number of text message conversations where the Defendants discuss—hours before any tweeting took place—sending SNOA to the "moon" at 5:58 p.m. that day. This was followed, hours later, by tweets touting SNOA and subsequent stock sales. From this, the Government argues that these "alleged facts speak for themselves," in that they "constitute critical evidence of the charged conspiracy," as if the criminality of the trading episode is self-evident and unassailable. It is not. The reality is that SNOA is far more complicated than the Government lets on.

Specifically, what the Government omits from its brief is that when the SNOA stock opened on May 3, 2021, it immediately began climbing, going from approximately $7.75 per share to approximately $9.20 per share by about 4:00 p.m., a nearly 20% increase. This price increase obviously piqued the interest of certain Defendants, Mr. Rybarczyk included, who began accumulating shares of the stock. Critically, there were no social media posts by the Defendants on May 3, 2021 until 5:58 p.m., long *after* the price of the stock had marched skyward, as the chart below indicates.



Put simply, the entire day that SNOA climbed and climbed, the Defendants said nothing. A number of Defendants even bought and *sold* shares before posting tweets. As an example, Mr. Rybarczyk purchased 30,000 shares shortly before noon, and then sold 10,000 of those shares at 3:14 p.m., netting a profit of $11,924. No social media posts had been made by any Defendant at that point—let alone Mr. Rybarczyk—so those profits could *not* have been fraud proceeds. Despite this, on page one of the Government's Exhibit 424-2, the Government includes those indisputably non-fraud proceeds when calculating Mr. Rybarczyk's profit from SNOA purchases and sales in order to present a misleading portrait of what occurred. In addition, far from supporting the Government's theory that these Defendants were simply front-loading shares to commit some preordained fraud, that Mr. Rybarczyk sold one-third of his total position *before* the first tweet or Discord post was even fired off, confirms that this was not the case. It would have made no sense

for Mr. Rybarczyk to sell if he knew that an upcoming scam would artificially propel the stock higher.

The Government claims that Mr. Matlock's (perhaps uncouth) comment, "we gon moon this bitch" is *prima facie* evidence of a criminal conspiracy concerning SNOA. It is not. There is no evidence that Mr. Matlock (or others) intended to engage in wash trading, or match trading, or any deceptive trading at all to artificially inflate the stock. Nor is there any evidence that the Defendants intended to put out any false or fraudulent statements. To the contrary, at 5:58 p.m. that evening, after the price had increased to nearly $11 (from $7.75) *without* any social media activity by the Defendants, Mr. Deel tweeted out *real* news about SNOA, namely, an approval the company had received from Austrian authorities. After this non-false tweet, the price of SNOA continued to increase as it had done for several hours before. Mr. Matlock's earlier comments were hyperbole and simply indicated his enthusiasm for the stock based on publicly available information which he believed to be true, and not part of a grand criminal conspiracy.

Then, when another Twitter follower pointed out that this "recent" development for SNOA touted by Mr. Deel was actually old news from 11 months earlier and relayed this information to Mr. Matlock, the Defendants commiserated as to how it had not been apparent from their research that the news was dated. Mr. Deel then published an immediate correction, explaining that he made a mistake.



Suffice it to say, it is extraordinarily rare—unheard of one could say—for fraudsters to correct news injected into the marketplace just minutes after learning that the news was not what it appeared to be. As highlighted by the Government's own exhibit, these individuals clearly candid private communications showed their *lament* at not having had the most up to date information in Mr. Deel's original post. This is the antithesis of fraud. Moreover, communications that the Government does *not* highlight in their brief further confirm that the Defendants' predictions of a price of $15 for SNOA stock were truthful predictions based on Mr. Deel's attempts to purchase SNOA stock earlier in the day, but being unable to fulfill his order, as set forth in one example below:



That's why the defendants arrived at a $15 price target—trading was thin enough in SNOA that significant volume could potentially drive up the price, as had been occurring throughout that day without any assistance from the Defendants.

The purpose of going through the complexities regarding SNOA above is to show that the 54 episodes proposed by the Government for exhibition at trial cannot simply be presented and digested in trivial amounts of time. Each episode—SNOA included—will be hard fought, with competing inferences from each tweet, each message, and each trade. This will be extraordinarily time consuming. Each "episode" involves complex issues of facts that change minute-by-minute throughout the day, all based on highly volatile stocks such as SNOA. While the government anticipates "an expedited presentation" at trial, the defense anticipates a trial that will last for months.

> 2. *Many of the other trading episodes sought to be presented expeditiously by the Government at trial will require days or weeks to explain to the jury.*

SNOA—even with all its complexity—is, in fact, one of the easier "episodes" to tackle. FCEL, set forth in Government Exhibit 29, encompasses trading over *sixteen days* from October 4, 2021 to October 20, 2021. CNTX, which is Government Exhibit 28, involves *seven weeks* of trading—October 20, 2021 through December 21, 2021. The Government has prepared six separate exhibits to discuss CNTX (an uncharged "episode"), and the main chronology consists of 76 pages of trading, messaging and tweeting records, involving more than 3 million shares and nearly $3 million in alleged profits. CNTX, standing alone, is more than sufficient for one trial, let alone as one of the 54 separate episodes in a mega-trial involving seven defendants, each represented by separate counsel.

CNTX is not an anomaly. The Government wants to introduce Exhibit 2, which concerns trading in ONTX over a six-week period in the summer of 2020. The operative chronology exhibit, Exhibit 2B, consists of 53 pages of tweets and trades. Critically, even reviewing just these two episodes plucked from the 54 chosen for trial by the Government (CNTZ and ONTX), it is virtually impossible to tell what the alleged fraud actually is given the length of time that these "episodes"

7

encompass, and the number of trades and tweets that the Government has packed into each Exhibit. What the Government's "episodes" actually show is how the Defendants—all day traders trading in and out of their positions rapidly—intersperse their trades (both buys and sells) with, at times, non-sensical tweets that were generally unintelligible or too immaterial to matter. *See, e.g.*, Mr. Rybarczyk's tweets contained in Govt. Exhibit 5 concerning TRCH ("$TRCH Rumors on Tesla from merger partner? $TSLA"); ("$TRCH HERE WE GO!"); ("2/16 WL PT I: $TRCH $TMBR $THMO $RIBT $RAVE"); *see also* Mr. Rybarczyk's tweets contained in Govt. Exhibit 16 concerning NAKD ("NAKD Hit another 500K https://t.co/oKLico1wBs"); ("BOAT LOADED AND GETTING EXTRA $NAKD – ENJOY YOUR WEEKEND TEAM! OUTER SPACE HERE WE COME"); ("ULTRA $NAKD THIS WEEK & NEXT WEEK & THE FOLLOWING WEEK").

Moreover, it is interesting that the example chosen by the Government in their reply brief (SNOA) is an episode that occurred over the course of a single day. But of the 54 episodes that the Government seeks to do an "expedited presentation" of, just *seven* are single-day trading episodes. The Government did not provide an "example," as they now argue—they provided an outlier. As noted, many of the episodes were weeks long, and some, such as Episode 94 (Govt. Exhibit 14B), involved the alleged pump and dump of CEI over a *four-month period* from August 3, 2021 to November 30, 2021. The exhibit that the Government has already prepared weighs in at an astounding *258 pages*. The exhibit is jammed with tweets, texts, and trades; but because of its length, it is nearly impossible to discern, once again, what the actual fraud is. Many times, the Defendants are tweeting and then selling small portions of their positions, entirely consistent with by-the-book day trading. At other times, as the records show, the Defendants were tweeting about

8

the stock, with no discernible price movement in the stock thereafter. As day traders, it was then rationale for them to exit the position, either in part or entirely.

*Finally*, although the Government claims that the legal basis for the admission of all 54 episodes is "undeniable," in fact, the defense does deny that there is a legal basis for the admission of these various trading episodes into evidence, even putting the Rule 403 issue to the side. While the Government relies on their "Notice" filed at Dkt. 319 back in July to demonstrate admissibility, the Government's arguments in that Notice are entirely conclusory. Far from proving that all the alleged trading episodes are "intrinsic to, or inextricably intertwined with, the charged fraudulent scheme," or even admissible pursuant to Rule 404(b), the Notice simply states that "Each of the Episodes occurred during the charged conspiracy period and constitutes conduct and transactions that parallel the charged conduct: pumping and dumping securities via false statements disseminated on Atlas Trading Discord, Twitter, or both." No other analysis is included.

As explained more fully in the separate reply brief filed by Defendant Constantin, simply reciting the permitted purposes of Rule 404(b) with no explanation for how the actual evidence fulfills those purposes (as the Government did in its Notice) does not justify admission of 397 separate trading episodes (or even 54 trading episodes) at trial. *See* Dkt. 319 at 2; Dkt. 424 at 3. And just using the words "intrinsic to, or inextricably intertwined with" and stating that each of the episodes "parallel" the charged conduct (Dkt. 319 at 1-2), does not actually make evidence of entirely different trading episodes *intrinsic to* the completion of separately charged trading sequences involving different stocks and different dates. That the trades and tweets allegedly involved the "same manner and means" or took place "during the time period of the charged conspiracy" is irrelevant. *See* Dkt. 424 at 3. Unlike with drug trafficking, it is *not* criminal to tweet and trade. Put simply, even setting the Rule 403 issues to the side, just to satisfy the threshold

admissibility rules each episode will need to be subject to its own time-consuming mini-trial, either before or during trial. This will cause considerable delay.

The issues raised above are just a few of the reasons why this case needs to be seriously curtailed prior to trial pursuant to Rule 403. The Government has culled 54 separate trading episodes—some lasting months—that will *not* be expeditiously presented at trial. The Government's plan will result in a trial stretching through the summer and into the fall.

### C. The Government's Attempts to Limit the Defense Case Should be Rejected

Having proposed a multi-month trial focusing on at least 54 separate alleged pump-and-dumps (with leeway to increase that number to 397), the Government now has the temerity to accuse the defense of making "troubling comments" about the "scope of their planned trial presentation," as if it is only the Government that is allowed to put on a case and any attempts by the defense to challenge the Government's case are improper. *See* Dkt. 424 at 7-10. The Government's arguments should be rejected.

    1. *Admission of "general market news" about at-issue stocks.*

*First*, the government argues that any admission of "general market news about the at-issue stocks" can occur only if there is a "foundation in the admissible record demonstrating that Defendants were aware of that news and it impacted their conduct during the at-issue episodes."

This argument makes little sense for a variety of reasons. *First*, the Defendants are alleged to be Twitter influencers. Clearly, if the Defendants are tweeting about a particular stock, they will, at the very least, have seen the "general market news" about that particular stock on Twitter. Requiring any additional "foundation in the admissible record" is not required. *Second*, even the evidence that the Government has produced in discovery confirms that the Defendants were not only aware of "general market news about the at-issue stocks," but were disseminating

at least some of that same news to their followers in publicly posted Tweets and Discord messages, as the examples below indicate:

Constantin's October 26, 2021 Twitter post about MYSZ was based on a company press release issued two hours earlier.



Indeed, press releases and real news formed the backbone for what the Defendants disseminated on social media.



11

*Third*, given that the Defendants are alleged to have participated in various pump and dump schemes, as described in more detail below, the presence of additional, "general market news" concerning the at-issue tickers demonstrates both that: 1) the Defendants did not cause any price increase or decrease, and 2) that the Defendants lacked the intent to defraud. The more "noise" present in the market at the time of various tweets, the less likely it is that any of the Defendants would believe that they had an ability, at that time, to affect the stock's price, whether through fraud or any other means.

In sum, the reason why references to "general market news" are a "significant cause for concern" for the Government is because this "general market news" helps defeat any inference that the Defendants acted with an intent to defraud. The Defendants were not fabricating fake news—like what occurs in a traditional pump and dump—they were finding and relaying real news.

    2. *Admission of "backward-looking causation in fact of the price movement".*

The issue of "causation" and its relevance to this case will be briefed more fully at a later date. But the Government's argument that "backward-looking *causation in fact*" is "irrelevant" to the issues of this case cannot be credited in the slightest.

Paragraph 1 of the Superseding Indictment filed at Dkt. 134 plainly states that the defendants "engaged in a scheme to 'pump and dump' securities," and that the Defendants profited "at least approximately $114 million from their scheme. The Superseding Indictment uses the word "pump" 23 separate times. The phrase "pump and dump" is included 16 separate times. In addition, the Superseding Indictment describes a scheme whereby the Defendants caused "other investors" to purchase a security and "artificially increase its price." *Id*. at ¶13. Each of the stock examples included in the Indictment also describes the episode as a "pump and

dump." As an example, the Indictment describes the collective "pump and dump" of SXTC, together with the "approximate combined profits" earned from the fraud. *Id*. ¶¶21, 31. In sum, the Government's entire case is built on causation—pumping a stock to raise the price and then dumping stock into that artificial price and volume. The Indictment even attaches a price tag to the causation—$114 million. To now claim that causation arguments are "irrelevant" to this case after the Government built this case around causation is entirely disingenuous.

The Government's own expert—Dr. Garibotti—even describes the Government's case as one reliant upon causation. In paragraph five of her report, she states that she understands that "the DOJ alleges that the Defendants in the above-cited case … made false and misleading statements during their trading in specific securities during specific time periods (the "At-Issue Trading Episodes") in order to '**pump**' (*i.e.* artificially inflate) the prices of those securities and subsequently '**dump**' (*i.e.* sell) their shares for a profit." Dr. Garibotti—the Government's own expert witness—was retained to "calculate the *profit* the At-Issue Traders realized during the At-Issue Trading Episodes." Although the Defendants strongly dispute that Dr. Garibotti is accurately calculating fraudulent proceeds (and will file an appropriate motion *in limine* later on the issue), in order to be admissible at trial, any calculation of profit *must* be causally linked to the alleged fraud in order to pass muster under Fed. R. Evidence 401 (the fact must be "of consequence in determining the action"). To the extent that this Court should be "prepared to preclude" anything "*in limine*" as the Government now demands, it is the exclusion of Dr. Garibotti based on the Government's own arguments.

Even the Government's FINRA "expert," Peter Melley, intends to heavily testify about issues related to causation. Melley wishes to testify about what a "pump and dump" actually is—describing it as a "stock manipulation scheme that attempts to *boost the price* of a stock or

13

security through false, misleading, or greatly exaggerated statements." A common aspect of such a scheme, Melley contends, is to pump stocks to "increase price and volume" and dump shares "via artificially inflated interest in the stock." Melley further intends to provide summary testimony about the "at-issue" stocks, linking together their trading volumes, prices, and Defendants' relevant social media activity. While the defense, once again, intends to move *in limine* to restrict or eliminate much of Mr. Melley's testimony, the Government may have already accomplished that goal in seeking to bar all evidence related to causation in their arguments here.

Even putting those dispositive issues to the side, the Government's arguments make no sense. *Of course* it is a critical issue in this case as to whether it was the Defendants or others who caused the various stock price movements. It is blindingly obvious that when a case is charged as a pump and dump, one key defense is that it was not the defendant who caused any artificial movement in the stock price. It is also blindingly obvious that people do not go around and commit fraud for no reason. Therefore, whether or not defendants were successful in their pump and dump endeavors goes directly to their motives and intent. In fact, the Government contends that the Defendants engaged in this scheme for a very specific reason— to gain $114 million. If the Defendants' tweets were not resonating with their followers and were not artificially driving up the price, why would they have tried to defraud anyone? Further, the DOJ's lead attorney on this case, Mr. Armstrong, when queried by this Court as to why Dr. Garibotti's "ultimate profit amount" was even relevant to the jury at the hearing held just two weeks, made this exact same point: "I think it goes squarely to motive, to explain why they were doing this, and it goes to their intent, because it was extremely profitable to trade in this manner

14

and hold themselves out as A, when, in fact, they were doing B. And so it explains why they had skin in the game to act in the way they did." (Tr. 09/07/2023 Hr'g at 72).

Now, the DOJ attempts to split hairs, on the one hand arguing that causation is irrelevant to motive and intent, but on the other hand arguing that "profit from the price movement" is relevant as a "matter of descriptive fact" in that Defendants "sought to capture gains for themselves at the expense of their followers." This is nonsensical. It is unclear how any person could "capture gains for themselves *at the expense of their followers*" if they did not cause those price movements in the first place. Did the Defendants owe some type of hidden fiduciary duty to others whereby they were obliged to give away their own profits derived from stock movements they did not cause to their Twitter followers? Of course not. Having pled this case as a "pump-and-dump," and having now realized that they cannot now prove the pump and dump, the Government attempts to shift gears by relying on specious arguments to exclude highly relevant (if not dispositive) evidence. The Government's unfair tilting of the scales of justice should be rejected.

## CONCLUSION

For all the reasons set forth above, as well as the reasons set forth in Rybarczyk's opening brief, this Court should exclude evidence of any trading episode not specifically identified in the Indictment from any April 2024 trial.

                              Respectfully submitted,

                              **HILDER & ASSOCIATES, P.C.**

                              /S/ *Q. Tate Williams*
                              Q. Tate Williams
                              Texas Bar No.: 24013760
                              Philip H. Hilder
                              Texas Bar No. 09620050
                              Stephanie K. McGuire

Texas Bar No. 11100520<br>
819 Lovett Blvd.<br>
Houston, Texas 77006<br>
(713) 655-9111–telephone<br>
(713) 655-9112–facsimile<br>
philip@hilderlaw.com<br>
tate@hilderlaw.com<br>
stephanie@hilderlaw.com<br>
<br>
Eric Samuel Rosen<br>
Constantine Economides<br>
Dynamis LLP<br>
225 Franklin Street, 26th Floor<br>
Boston, MA 02110<br>
Tel: (617) 802-9157<br>
erosen@dynamisllp.com<br>
<br>
ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

    I hereby certify that on September 22, 2023, a true and correct copy of the above and foregoing reply brief was served on all counsel of record via ECF, certified mail, return receipt requested, facsimile, electronically, or hand delivery.

/s/ <i>Q. Tate Williams</i><br>
Q. Tate Williams